ABEGG *et al. v.* SCHWAB *et al.*

(*Supreme Court, General Term, First Department.* April 18, 1890.)

</div>

ASSIGNMENT FOR BENEFIT OF CREDITORS—FRAUD.

    A debtor owing $90,000 confessed judgments in favor of several creditors, to "protect" them, and then made an assignment by agreement with the assignee and creditors, though none of the creditors were pressing him. The estate was levied on under two executions issued on the judgments before the assignee took possession, and, on refusal of all the creditors to accept a settlement of 50 per cent., was purchased by three of the judgment creditors, for $11,800, which was credited on the execution. Two of the judgment creditors bid less than was required to protect their judgment; another bid much more than the amount of his judgment; while another did not bid at all; and the totality of the bids was distributed over the entire group of executions. The goods were turned over to a firm composed of the assignor's brothers, and formed its entire capital, on the agreement of the firm to pay $12,700 to the judgment creditors, the amount due from the assignor. The same lawyer drew the confession of judgment, the assignment, and the articles of copartnership. The firm thereupon appointed the assignor its general manager, leaving him in full control and possession, under power of attorney, and the claims were paid to the judgment creditors a.few days thereafter. *Held,* that the confessed judgments and the assignment were fraudulent and void. Affirming 7 N. Y. Supp. 46.

Appeal from special term, New York county.

Action by Henry Abegg and others, composing the firm of Abegg, Daeniker & Co., against Emanuel Schwab individually, and as surviving member of the firm of Schwab & Son, Hermann Trohmann, as assignee of Emanuel Schwab, Joseph Lillienthal, Theresa Schwab, and Levi J. Gazan, to set aside judgments confessed by defendant Schwab, and also an assignment of all his property as fraudulent. There was a decree for plaintiffs, and defendants appeal. For former report, see 7 N. Y. Supp. 46.

Argued before VAN BRUNT, P. J., and BARTLETT and BARRETT, JJ.

*Leopold Wallach*, for appellant Trohmann. *Samuel Greenbaum*, for appellant Lillienthal. *J. H. V. Arnold*, for appellant Theresa Schwab. *L. W. Emerson*, for appellant Emanuel Schwab. *Blumenstiel & Hirsch* for respondents.

BARRETT, J. The only embarassment in this case arises from some preliminary observations in the opinion of the learned judge at special term. He there estimated the value of the assigned estate, and attempted to show that the confessed judgments exceeded in amount one-third of such estate. From this alone he deduced the conclusion that judgments might be declared unlawful and void. If the decision of this appeal rested upon either the accuracy of this estimate, or the correctness of the conclusion drawn therefrom, we would have much difficulty in sustaining the judgment. The learned judge's estimate was based upon collections up to a certain date, but the assignee had not yet completed his labors, and there was every reason to believe that the estate would produce something more in the future. Even upon the estimate then made, one-third of the estate amounted to $12,249.78, while the judgments were for but $12,700.05; certainly a very narrow margin upon which to predicate an intentional evasion of the statute. A careful consideration of the entire opinion, however, has convinced us that the learned judge did not intend to rest his judgment upon these preliminary observations, that they were merely suggestive and prefatory, and that the case was really disposed of upon the distinct question of fraud. This becomes more apparent as we scan the findings, where this estimate nowhere appears, and where the real determination is to be found. Indeed, this point, as discussed in the opinion, was not made in the pleadings or upon the trial, and it is quite evident that it was simply an impression which occurred to the learned judge while preparing his opinion, and which, though irrelevant to the result, was deemed worthy of suggestion. With the opinion from this point on, and with the findings of fact which followed, we are in entire accord. There cannot be the slightest doubt that the confession of judgment and the assignment were a single transaction, intended to hinder, delay, and defraud creditors. The *indicia* of fraud in this case, as fully, clearly, and accurately stated by the learned judge at special term, are unusually transparent. Indeed, it is difficult to credit the sincerity of the oft-repeated statements, pressed upon us with special emphasis, to the effect that the findings of fraud are without a particle of evidence to support them, and that there is not enough in the case to warrant even a suspicion of fraud.

Without commenting upon the propriety of such criticisms upon the findings of a judge, and looking for some reasonable ground for the position thus taken by counsel, we must conclude that he refers to direct evidence, as distinguished from circumstantial; for otherwise we should be compelled to treat the criticism as indicating a lack of moral sense. It is true the case may be said to be wanting in what is technically called "direct evidence," but the circumstantial evidence of fraud is abundant and conclusive. And it is well settled that fraud may be inferred from a group of circumstances pointing clearly in that direction. See *Shand* v. *Handley*, 71 N. Y. 323; *Brackett* v. *Griswold*, 14 N. Y. St. Rep. 449. Many links in the chain, considered separately, may well appear to be wholly unobjectionable, and yet all of the links, considered in their relation to each other and as a whole, may point unerringly to fraudulent purposes and acts. That is the case here. Indeed, the conduct of these people was exceedingly barefaced. Some of the debtor's most important books were missing, and were not satisfactorily accounted for. His declarations and purchases, not long before the assignment, would seem to furnish good reason for the suppression of these books. They certainly suggest a grave suspicion of the fraudulent disposition of property

prior to the scheme under consideration. There, too, the execution of the entire scheme, commencing with the confessed judgments, and ending with the creation of the new firm of Schwab Bros., was intrusted to a single agent. This was one of the most questionable features of the transaction. The attorney who drew the confessions also prepared the assignment. He saw to it, with due provision, that the sheriff should be in possession a few minutes before the assignee arrived. He then acted as counsel for all parties, assignor, assignee, and judgment creditors. He was active throughout, advising and directing, and finally he even drew the articles of copartnership between the assignors' brothers, and also the power of attorney from these brothers to the assignor, under which the debtor practically resumed his original position as head of the house and owner of the goods. This is an apt illustration of the truth of what we have said with regard to isolated acts, innocent in themselves, becoming indefensible, when looked at in their entirety. There certainly was no objection to an attorney drawing a confession of judgment. The preparing of an assignment was also a proper professional act. So was the drawing of articles of copartnership and a power of attorney. So was the giving of advice to each of the persons in question. And yet there is nothing in professional ethics better understood than the inexpediency and even impropriety of the mingling of such legal relations. The only unassailable feature of the entire transaction seems to have been the foundation of the confessed judgments. The fact, however, that they were confessed for *bona fide* debts does not exclude the fraudulent intent. It is, of course, an important circumstance, but as was said in *Billings* v. *Russell*, 101 N. Y. 228, 4 N. E. Rep. 531, it is not inconsistent with an intent on the part of the debtor to defraud his creditors. The way in which these judgments were confessed, the agencies resorted to, and above all the use which was made of them, stamp the transactions as a plain attempt to utilize *bona fide* debts to keep creditors at arms-length, and to enable the debtor, without being harassed by such creditors, to retain possession of the goods, and to sell them at his leisure; meanwhile supporting himself and his employes out of the proceeds. This is precisely what he effected by the methods which were resorted to. The sheriff's sale was a mere sham. The preferred creditors pretended to purchase the bulk of the goods, but never paid a penny or received a penny's worth of goods. The debtor simply kept the property under the weak device of a partnership between a couple of his old clerks, (who, as we have seen, were his brothers,) and agreed—nominally through these brothers—to pay the judgment creditors as he realized from the goods. There was a pretense that the judgment creditors bid at the sheriff's sale to protect their judgments. But that was a very shallow pretense, for there was ample property to cover their judgments, and, besides, the biddings had no relation to the judgments. In fact, this pretense was worked out in a singularly inartistic and slovenly fashion, reflecting but little credit upon the directing mind; for it appears that two of the judgment creditors bid in considerably less than was required to protect their judgments, while another bid in enough to satisfy eight or nine such judgments as his, and still another failed to bid at all. The peculiar significance of these circumstances lies in the fact that the creditors who thus bid in over $11,000 worth of property actually paid nothing and received nothing at the sale; that the auctioneer simply gave them receipted bills, taking in his turn a receipt from the sheriff for the total amount of the bids; and that the sheriff, instead of crediting each of the executions with the amount of each creditor's bid, actually distributed the totality of the bids over the entire group of executions; all this without a dollar having passed, and without the debtor having been in the least disturbed in his actual possession. The consequence was, the creditors who had bid nothing, or not enough, found their executions satisfied by the application of the nominal surplus, resulting from the purchases of the creditor, who had bid too much; while the creditor

who had bid too much found his small judgment satisfied by the application of a part of his bid, and the rest of his purchases devoted to, as it were, "book-keeping off" the other judgments. And yet, in the face of all this, we are gravely told that this sale was *bona fide*, because it was properly advertised, and conducted according to the forms of law. The whole proceeding simply amounted to the judgment creditors telling the debtor that they would not press him; that he might keep the goods, and, as he sold them from time to time, pay them what he owed them; and all this to the entire exclusion of the other creditors. This was clearly the purpose. To effectuate it, the scheme contemplated the use of the forms of law and the processes of the courts, and these forms and processes were used and abused accordingly. The pretended partnership between the two brothers of the debtor was as transparent as the sale and all that preceded it. The debtor became the general manager of the business, at a larger salary than its nominal heads, with authority to draw checks to the exclusion of his pretended principals. Looking at the evidence on this head, it is almost inconceivable that any one should have believed that its transparency would escape attention. It is needless to dwell further upon the facts in this record. Those facts have been carefully analyzed by the learned judge at special term, and we have sufficiently supplemented his views to indicate our clear opinion that the record discloses a bald case of fraud, which was properly condemned. The exceptions are worthy of no special consideration. No error was committed in the admission or exclusion of evidence. The requests to find which were refused involved either matter already found, or matter which was irrelevant or mere evidence. The defendants were in no wise prejudiced by these refusals. The merits of the case are clearly presented by the findings made, by the evidence, and by conceded facts. From all these, we deduce the conclusion that the judgment appealed from was just and right, and that it should be affirmed, with costs.

VAN BRUNT, P. J., concurs. BARTLETT, J., concurs in the result.