SMITH *et al.* v. WHITE *et al.*

(*Supreme Court, General Term, First Department.* November 23, 1888.)

1. ASSIGNMENT FOR BENEFIT OF CREDITORS—FRAUDULENT PREFERENCES.

    Where an assignor for benefit of creditors preferrred the firm of which the assignee is a member, and it appears that, from his expectation to derive some benefit from the administration of the property, and from an agreement between him and the assignee, in relation to the purchase of a portion of the property, and from his attempts to borrow money from the assignee's firm, because of such preference, the assignor expected to be benefited by the assignment, and that the preference was for that purpose, the assignment is properly declared to be fraudulent.

2. SAME—CONCEALMENT OF PROPERTY—EVIDENCE.

    Concealment of property is not sufficiently shown by the assignor's testimony that goods of the value of $700 were in his house at the time of the assignment, and were never delivered to the assignee, but were sold to various people in the same city, of whom he cannot name one, or of whom he afterwards names one, but cannot give the circumstances, or the quantity sold to him; nor by the testimony of his wife that she retained the goods for her wages; the assignee testifying that he procured goods from the house, and, on examination, found no others, and it further appearing that the assignor attempted to borrow money to relieve his necessities, which necessities were the alleged cause for selling the goods.

3. SAME—SALE BY ASSIGNEE TO HIS OWN FIRM—EVIDENCE.

    Evidence that the assignee, fearing that he would be deprived of the property, and lose his preference, applied to H., who, after a superficial examination, purchased it with money belonging to the assignee's firm; that a clerk of the firm was placed in charge, and the assignor and his wife were employed about the premises; that a part of the property was consigned to and sold by the firm, and another part was stored, under its control, which latter part was sold by, and the price paid to, the assignee's partner; that H. gave no attention to the business, and made no entries respecting it in his books, and alleged that he repaid the partner in bills, instead of a check, because of convenience, but paid other debts by check,—sufficiently shows that the assignee's firm was the real purchaser.

Appeal from special term, New York county.

Action by M. V. B. Smith and others, judgment creditors of James White, against James White, Charles Wise, and others, to set aside an assignment for benefit of creditors by White to Wise. Judgment for plaintiffs, and defendants appeal.

Argued before VAN BRUNT P. J. and BRADY and BARTLETT, JJ.

*Otto Horwitz,* for appellants. *A. Blumenstiel,* for respondents.

VAN BRUNT, P. J. This appeal is based entirely upon a consideration of the facts, and it is claimed that the evidence introduced upon the trial failed to support the findings of fact of the court below. The action was brought to set aside an assignment made by the defendant James White to the defendant Charles Wise, for the benefit of creditors. In and by said assignment were preferred certain indorsements of the firm of L. & C. Wise, of which the assignee was a member, and also an indebtedness due by the said James White to the said firm of L. & C. Wise. There were next preferred certain debts of James White to one John Dwyer. It was claimed upon the part of the plaintiffs, who are judgment creditors of James White, that this assignment was made with intent to hinder, delay, and defraud the creditors of James White. And it is claimed that the evidence shows that there was a fraudulent concealment of property by James White, and that a fraudulent arrangement was entered into, between the assignor and the assignee, whereby the assignor was to receive certain benefits out of the assigned property. The evidence to establish these propositions was largely circumstantial, and depends upon inferences to be drawn from the acts of the parties in reference to the assigned estate. It is true that, in regard to the arrangement for the benefit of the assignor, the assignor has directly testified to such agreement; but it is apparent, from the nature of the testimony of the assignor, that no reliance whatever can be placed upon any evidence which he gave, unless it

is in some way corroborated by the other evidence in the case, or the circumstances which have been established otherwise than by his testimony.

The evidence of the assignor, in reference to his disposition of the $700 worth of goods, which he claims were in his house at the time of the assignment, and which were never delivered over to the assignee, is of such a character as conclusively proves that any evidence that he might give is totally unreliable. It appears from his testimony that he sold this $700 worth of goods for the purpose of supplying necessaries for his family; that he was in great need of money; that he sold these goods to various people, all in the city of Brooklyn, but he is not able to name a single person to whom he sold a single article. This story is absolutely incredible, and is undoubtedly false. It is impossible for anybody to place any credit upon a statement so palpably false as this. The fact of the sale of these goods, certainly, was a matter of some importance to the assignor at this time, in view of his alleged necessitous circumstances; and that he should have sold the whole, without being able to name a single purchaser, and all in Brooklyn, cannot be credited. It is true that he subsequently testified to the fact that he sent some of these goods to the firm of A. S. Richards & Co but how much, when, or where, is in no way disclosed. The story upon the part of the wife of the assignor, that these goods were retained by her, from time to time, because of her wages, which remained unpaid, is equally incredible. This seems to have been an invention of her own, because, during his examination, the assignor, White, seems to have claimed these goods, and he and his wife do not seem to have been exactly in accord as to the circumstances under which these goods were retained in his house. It is true that it is urged, upon the part of the assignee, that this story is entirely a fabrication, and that no such goods ever existed; that there were certain goods, a part of the stock of leather, in the house of the assignor, which the assignee procured, and he then examined, and did not find any other goods there; and such a quantity of goods as testified to by White could not have been there, without his seeing them; and it may be that the existence of these goods was due to the fertile imagination of the assignor If the assignor had these means at his command, why should he be so solicitous, immediately after the assignment, to obtain money from the assignee. The evidence is beyond dispute that attempts were made, that his necessitous circumstances were pleaded, in order that his old friends L. & C. Wise, who had been the consignees of his goods, should relieve his necessities. It becomes necessary, therefore, in order to sustain this charge of fraud, that we should look to see whether any evidence to show that a fraudulent intent existed upon the part of the assignor can be found from those facts which are established from other sources, without the evidence of the defendant and his wife. It seems to us plainly deducible, from the evidence of the other witnesses in the case, that the defendant White did not intend to part with his property, for the purpose of paying his creditors, without the hope of ultimate reward He believed that he would derive some benefit from the administration of this property, after the assignment. From what this belief arose, we are not informed, except so far as it supports the statement which was made by White of the agreement between himself and the assignee, as to his future employment. But that such a belief existed, seems to be beyond question established by the evidence of Wise, who states that, in a conversation had shortly after the assignment, when White was being shoved aside, that White did not like it at all, and stated that he did not think the business was to be done in that way; that he thought he was going to run the factory. It further appears from the evidence of the assignee that, in respect to the horse and the yacht, it was understood between the assignee and White that he should get the yacht and the horse and wagon, and that the assignee told him he would protect him all he could, and that he should have the first chance, provided he paid as much as anybody else. It further appears that

the assignee allowed White to select appraisers for the yacht, in order to determine the value at which it was to be turned over to him; and White seems to have thought his rights in reference to the yacht, in consequence of the agreement made, were of such a character as justified him in taking possession of the same, and it required legal proceedings on the part of the assignee to get it back. The whole atmosphere surrounding the inception and the carrying out of this assignment shows that it was not made in good faith on the part of White, but that it was made for the purpose of getting some benefit therefrom, and that his preference of the debts due to L. & C. Wise were made because he expected to derive some benefit therefrom, from the firm of L. & C. Wise, and not simply for the purpose of paying their debt. The attempts to borrow money immediately after the assignment were indicative of this. The inference naturally follows, from the circumstances attending these loans, that they were applied for, based upon the fact that in the assignment White had preferred L. & C. Wise. Loans seem to have been made to Mrs. White by the firm of L. & C. Wise. They may possibly have been induced by this consideration. But it is entirely immaterial how great may have been the good faith of L. & C. Wise, in respect to this assignment, if we find from the whole evidence that there was a fraudulent intent upon the part of James White, or that the assignment was made by him because he supposed that he was going to get some gain therefrom. Whether the hope was well founded or not, the fraudulent intent existed, which invalidated the act, as against all his creditors. The inferences, therefore, which were arrived at by the court below, are not so unsupported by testimony as would justify this court, which has not the witnesses before it, in disturbing the conclusion, even if we thought that the weight of evidence was in favor of the defendant. But upon a consideration of the circumstances attending this assignment, and the subsequent acts of the parties thereunder, we cannot but come to the conclusion that, at least, James White was actuated by a fraudulent intent in making this disposition of his property, which he had a right to do, if actuated by proper motives. ●

There is another transaction which is attacked by the plaintiffs in this action. It is a sale of a portion of the assigned property to one Hirsch. It is claimed, upon the part of the plaintiff, that the conclusion drawn by the court that this was a sale by the assignee to his own firm, is amply supported by the evidence showing the transaction in all its details. That there was evidence enough to sustain the conclusion of the court in this regard, we cannot doubt. It may be, however, that the conclusion is more strongly established by the failure to prove facts than by the facts established. The circumstances proved were of such a character as necessarily to call upon the defendants for explanation, and satisfactory explanations were not forthcoming, and the absence of such explanations necessarily led to the one result. It appears from the evidence that the assignee's firm of L. & C. Wise were largely engaged in business, as commission merchants, and that the defendant Leon M. Hirsch was also engaged in business, as a large shoe-dealer, in Grand street. They appear to have been acquainted with each other for a considerable length of time, but it does not appear that they had had any commercial dealings of any magnitude, prior to the one in question. The assignee, being fearful that replevin proceedings would take out of his possession a considerable part of the assigned property, and thereby the chance of his firm getting their preference largely diminished, concluded that it was necessary to get rid of the assigned property in the shortest manner possible, and Hirsch was applied to, for the purpose of carrying out this scheme. After a very superficial examination of the property to be sold, he buys the same, with money borrowed from Leopold Wise, and which appears to have been advanced by the firm of L. & C. Wise to Leopold Wise. This money, or some portions of it, Hirsch claims to have repaid, in bills, no check ever having passed, and no account

of the same ever having been entered in any book.   All that is presented, are receipts for the money, and some loose *memoranda* on manilla paper.   It appears that, immediately after this purchase, a nephew of L. & C. Wise, and a clerk in their employ, is put in charge of the property; that White and his wife are employed upon the premises; that almost all the goods manufactured are consigned to L. & C. Wise, and sold by them, and that leather, which was in the factory, was stored, at the suggestion of L. & C. Wise, under their immediate control.   It further appears that the policies of insurance were only taken out for three months.   It further appears that when, almost immediately after, a purchaser for the leather in this warehouse was sought, the Wises conducted the negotiations for the sale, and received the money, upon its sale, and that, in fact, Hirsch paid no attention whatever to the business, saw nothing of the contents of the books kept at the factory, and had no entries in his own books in respect thereto.   The excuse which Hirsch gave for making his payments to L. & C. Wise in bills, was that large amounts of bills were received in his store on Saturdays, and that he did not want to go to the bank and deposit them, so he handed them over to the Wises.   But a different influence seems to have operated when he was paying for his purchases, and also when he was giving Marcus Wise, who was in charge of the property, the money paid for labor at the factory.   He states that the reason why he gave checks for all the purchases that he made, was that he did not want to give the boy $500 or $600 in bills, and that he did not always have them in the store; and immediately thereafter he states that he paid Wise in bills, because he had them in the store, and did not want to go to the bank,—an inconsistency which shows conclusively the fact that all this maneuvering was done to cover up the real transaction.   Business men do not do business in that way.   Their operations are entered in their books, and payments are made by checks, rather than by bills; and it is only when it is deemed desirable that the transaction should not be traced that bills are resorted to.   If checks had been used in these payments to Wise, it could have been ascertained, beyond all question, precisely how the account stood, and where the money came from; but it being claimed that these payments were made in bills, it is impossible to determine whether they were payments in fact, or mere receipts given, L. & C. Wise being all the time the real parties in interest.   That they were such, seems to be evidenced by all their actions.   They seem to be the ones, through their clerk, who controlled the factory, and they also seem to have been the ones who interested themselves in the sale thereof, and this pretended loan from Leopold Wise to Hirsch seems to have been solely for the purpose of covering up the ownership of L. & C. Wise.   It is impossible to discuss all the evidence taken in this case at length, but the deductions which have been drawn therefrom are not of such a character that this court should interfere with these conclusions.   It is true that they are supported by inference, rather than by direct evidence, but when we consider all the circumstances surrounding the case, and the atmosphere which prevades every act done in connection with it, we cannot but come to the conclusion that there was something wrong about the whole transaction.   We are therefore of opinion that the judgment should be affirmed, with costs.

BRADY, J., concurs.   BARTLETT, J., concurs in the result.