STEPHEN COURSEY *et al.*, Appellants, *v.* JOHN MORTON *et al.*, Respondents.

*Court of Appeals, March* 15, 1892.

1. *Assignment for creditors. Fraud.*—The intentional withholding and secreting of assets of a substantial value from the possession, of the assignee is a fraud upon the rights of creditors and renders the assignment void.
2. *Same.*—Where the acts of an assignor are voluntary and necessarily operate to defraud creditors, he must be deemed to have intended to defraud.
3. *Same.*—The assignor has no right to retain, and secrete money for the purpose of using it in effecting a compromise.
4. *Same.*—The payment of such money to the assignee, after an action is brought to set aside the assignment as fraudulent, does not validate it.

Appeal from a judgment of the general term, fourth department, affirming a judgment entered upon the report of a referee.

*Louis Marshall*, for appellants.

*George Barrow*, for respondent Smith.

*Goodelle & Nottingham*, for respondents Vietor and Achelis.

*Waters & McLennan*, for respondents J. & T. Morton.

HAIGHT, J.—This action was brought to set aside a general assignment for the alleged benefit of creditors upon the ground of fraud.

John and Thomas Morton were co-partners engaged in the manufacture of shawls under the firm name of Morton Brothers, at Skaneateles, N. Y. On the 13th day of September, 1887, they executed an assignment in writing to the defendant Sidney Smith of all their property, real and personal, owned by them as co-partners and separately and individually, excepting such as was by law exempt from levy and sale under execution, in trust for the payment of their debts. The trust created by the assignment was accepted by the assignee in the form required by the statute, and the assignment was then delivered to the attorney who drew it, with the understanding that he should proceed to New York with the assignor, Thomas Morton, and if possible procure from Messrs. Vietor & Achelis a further advance upon the stock of shawls shipped them, and in case of their failure to procure an advance, to have the assignment recorded. The assignment was left with a person in Syracuse by the attorney, with directions to record the same if he should wire him so to do, and then on the evening of that day the attorney, with Thomas Morton, proceeded to New York. On the morning of the next day they attempted to procure the advance upon the shawls and failed, and thereupon the attorney telegraphed to the person with whom he had left the assignment to have it recorded, and the same was so recorded in the office of the clerk of the county of Onondaga on the afternoon of the 14th day of September, 1887, and thereafter, and on the 5th day of October they executed and filed an inventory and schedule of their assets and liabilities duly verified as required by statute.

The complaint alleges that the said assignors have omitted from the inventory and schedules filed by them in the Onondaga county clerk's office a large amount of moneys for the purpose of defrauding their creditors. This allegation was denied by the answer.

The facts upon this issue are without substantial dispute. They are as follows : On the morning of the 14th of Sep-

8

tember, 1887, after the assignment had been drawn and executed as above stated, but before it had been recorded in the clerk's office, John Morton drew from the Skaneateles Bank upon the firm check signed by him $963.50, and delivered the same to his wife, who secreted it in her breast and thus retained it secreted upon her person for about eight months, or until about the 1st day of May, 1888. In delivering the money to his wife he told her to put it away and hold it until he called for it again. Before drawing the money from the bank Morton had a talk with his attorney in reference thereto, and asked what they would do for living expenses, and they were told that they would have to get along as best they could, but everything they had must go to their assignee. Morton then asked him if they had a right to pay debts, and was advised that they had a right to draw the money before the assignment was delivered and pay just and *bona fide* debts with it. John Morton testified that in March previous he had obtained from his wife the sum of $300, moneys which she had saved out of that furnished her by him for household expenses, etc., and that when he drew the money from the bank he first intended to repay his wife the money had from her, but afterwards he thought it would not be right to pay her, and so he held it to give to any one that it belonged to. This statement he subsequently changed, and testified: " When I changed my mind in regard to paying my wife I expected to use the $963.50 to compromise with our creditors." On the 21st day of January, 1888, he was examined in supplementary proceedings, and on that occasion testified that the firm had no personal property aside from the shawls in the hands of the parties in New York and no money in the bank, but upon a further examination upon the 3d day of February thereafter admitted that he had the $963.50 in his house " awaiting for whoever it belonged to."

Thereafter and on or about the first day of May, upon the demand of the assignee, the money was paid over to him.

This was about four weeks before the trial of this action. John and Thomas Morton testified that the assignment was made for the purpose of gaining time, but that it was not made with the intention of hindering, delaying or defrauding creditors. The money in question was not entered upon the inventory; the attorney who drew up the inventory testified that he supposed he knew all the circumstances in relation to the assets as well if not better than the Mortons did themselves, and that he made up the schedules without consulting them.

The rule is that the intentional withholding and secreting of assets of a substantial value from the possession of the assignee is a fraud upon the rights of creditors and renders the assignment void. Shultz *v.* Hoagland, 85 N. Y. 464; Talcott *v.* Hess, 31 Hun, 282; Iselin *v.* Henlein, 16 Abb. N. C. 73; Chambers *v.* Smith, 38 St. Rep. 213.

The claim of Mrs. Morton was not one which under the circumstances could be paid out of the assets of her husband or that of the firm, and Morton wisely refrained from making use of the money drawn from the bank for that purpose. Coleman *v.* Burr, 93 N. Y. 17.

Morton first tells us that after reaching the conclusion not to pay his wife that he then " held it to give to any one that it belonged to." But he knew that it belonged to the assignee and that it was the money of the firm; that he and his brother had made a general assignment of all of their property; that the assignment included this money, and that he had been advised by his attorney before drawing the money that everything they had must be turned over to the assignee; that if any debts were paid they must be *bona fide* debts and paid before the assignment was delivered. He had not used the money to pay debts before the assignment was delivered; he had never used it to pay debts, but instead thereof had during the eight months that intervened after the assignment kept the same secreted upon the person of his wife.

It is said that the money was omitted from the inventory for the reason that it was made up by the attorney without consulting the Mortons, and John says he supposed the money was in, but it was signed and sworn to by them. John says he did not examine it, but as we have seen as late as January 21, 1888, in giving his testimony in supplementary proceedings, John still insisted that they had no personal property aside from the shawls in the hands of the parties in New York, and no money in the bank. These are the excuses given, but they do not change the main facts. The $963.50 belonged to the firm and was omitted from the inventory; it was drawn from the bank after the assignment was executed and before it was recorded and was secreted upon the person of the defendant John Morton's wife for the space of about eight months thereafter, and until it had been discovered in legal proceedings instituted for that purpose.

Every party must be deemed to have intended the natural and inevitable consequences of his acts, and where his acts are voluntary and necessarily operate to defraud others he must be deemed to have intended the fraud. Coleman *v.* Burr, *supra;* Cunningham *v.* Freeborn, 11 Wend. 240–252; Ford *v.* Williams, 24 N. Y. 359; Edgell *v.* Hart, 9 Id. 213; Wilson *v.* Robertson, 21 Id. 587–593.

The necessary and inevitable consequences of the acts of Morton, as above related, were to deprive the creditors of the money so retained by him, and they were thus defrauded out of that which belonged to them. True, he says he did not intend to hinder, delay or defraud, but his acts necessarily did defraud, by depriving the creditors of that which belonged to them, and in the eye of the law he must be deemed to have intended that which he knew to be the inevitable consequences of his acts. But he says he retained this money expecting to use it to compromise with his creditors. It appears that after the assignment an effort was made on the part of his attorney to bring about a compromise. This fact does not change the character of that

transaction. He had no right to retain and secrete the money for the purpose of using it in effecting a compromise. Whilst a creditor has the right to make a statement of his financial condition and ask his creditors to compromise, an assignor has no right to secrete a part of his assets and then induce his creditors to accept a less sum than they otherwise would, under a supposition that the whole assets had been disclosed in the inventory.

The money retained was of a substantial amount. It was substantially all of the assets of the .copartnership that were at the time available. There was real estate, but it appears to have been heavily encumbered with mortgages. The shawls manufactured by the firm had been shipped to dealers in New York for sale, and they had advanced thereon all that they could be induced to. There was some office furniture and coal on hand, and four hundred pounds of wool, some mill supplies and mill machinery, and $600 that belonged to Thomas Morton individually. These were the assets. The liabilities exceeded $20,000 in amount. It will therefore be readily seen that the money withheld by the defendant John was an important, if not the greater, part of the assets.

It is said, however, that because the money was paid over to the assignee that no harm has been done to the creditors It was not, however, paid over until after this action was brought and nearly ready for trial. At the time the action was brought the money was fraudulently withheld from the assignee and the assignment was then void. The Mortons could not by their subsequent acts be permitted to change the rights of the parties as they then existed. To do so would be equivalent to saying to assignors in the future that they could retain and secrete such portion of the assets as they saw fit, and if not discovered it would be all right, but if discovered they could at any time before the trial turn the same over to the assignee, and thus maintain the validity of their assignment.

It appears to us that the exceptions were well taken to the refusals to find the 9th, 10th and 10½th requests, and to so much of the 10th finding of fact as related to the matter discussed, and that the judgment should consequently be reversed and a new trial granted, with costs to abide the event.

All concur, except BRADLEY, VANN and BROWN, JJ., dissenting.

BRADLEY, VANN and BROWN, JJ., dissenting were of the opinion that, while the general term might, with great propriety, have reversed the judgment upon the ground that the findings of the referee were opposed to the weight of evidence, still, as there was some evidence to support the referee's conclusion, this court could not interfere.

---

NOTE.

As to effect of witholding assets upon the assignment, see Fay *v.* Grant, 53 Hun, 44; Rothschild *v.* Salomon, 52 Id. 486; Illinois W. Co., *v.* Payne, 58 Id. 603; Chambers *v.* Smith, 60 Id. 248; Servis *v.* Holwede, 58 Id. 602; Wilcox *v.* Payne, 55 Id. 607; Vietor *v.* Nichols, 47 Id. 635; Acker *v.* Leland, 109 N. Y. 5; Blain *v.* Pool, 47 Hun, 633; Phillips *v.* Tucker, Id. 631; Passavant *v.* Cantor, 62 Id. 623.