(20 Misc. Rep. 67.)

NEWMAN v. CLAPP et al.

(Supreme Court, Special Term, New York County.    March, 1897.)

1. WITNESSES—RIGHT TO IMPEACH.
    In a creditors' suit to set aside an assignment for the benefit of creditors, *held*, that the testimony of the assignors, though called as witnesses for the plaintiff as to the fact of an alleged indebtedness of the assignors, might be disregarded, and the question determined upon other evidence whether such alleged debt was genuine or a fabrication.  Becker v. Koch, 10 N. E. 701, 104 N. Y. 394, followed.

2. FRAUDULENT CONVEYANCES—PAYMENT TO WIFE OF DEBTOR.
    *Held*, upon the evidence, that an alleged debt from the assignors to the wife of one and the mother of the other of them was not bona fide, and that payment of the assignors' assets purporting to be on account of such debt was in fraud of creditors.

3. SAME—PAYMENT OF PARTNERSHIP DEBT OUT OF INDIVIDUAL ASSETS.
    Further *held* that, assuming the fact of the loan by said wife, it was, upon the explicit and uncontradicted proof, a loan to her husband personally, and not to the assignors' firm of which he was a member.

4. SAME—PAYMENTS IN CONTEMPLATION OF ASSIGNMENT.
    *Held*, further, that the payments by the assignors' firm, on pretended account of said alleged debt, were made in contemplation of the assignment, and intended to defraud the creditors of the co-partnership.

(Syllabus by Pryor, J.)

Action by Walter G. Newman, as trustee, against Dwight O. Clapp and others. Judgment for plaintiff.

. S. D. Epstin, for plaintiff.

Simpson & Werner and Franklin A. Coles, for defendants.

PRYOR, J. The complaint impugns the validity of a firm assignment for the benefit of creditors, on the ground that the assignors, in contemplation of the assignment, retained a portion of the copartnership assets from its operation. The fact is conceded that, on the eve of the assignment, the assignors withdrew $10,300 from the funds of the firm, leaving but $10,060.65 for the liquidation of liabilities to the amount of $204,509.59. Of the sum so withdrawn, $505.22 is not accounted for; $4,494.78 was paid to Mary C. Clapp, the wife of one assignor, and the mother of the other, in discharge of a debt not now contested; and the balance, $5,300, was delivered to her in partial payment of $23,000, alleged to be due her on a pretended loan to the assigning copartnership. It is upon the misappropriation of this $5,300 and another sum of $2,000 that the plaintiff relies for impeachment of the assignment.

The proposition is not to be controverted that "an intentional withholding and secreting by the assignor of assets of a substantial value from the possession of the assignee is a fraud upon the rights of creditors of the assignor, and renders a general assignment for the benefit of creditors void." Coursey v. Morton, 132 N. Y. 556, 30 N. E. 231. But the defendants contend that the $23,000 was honestly owing by the firm to Mrs. Clapp, and that the payments to her were not made in contemplation of the assignment. The assignors, called by the plaintiff, gave evidence tending to maintain the defense; and on the trial I doubted whether, in view of the rule propounded in Fordham v. Smith, 46 N. Y. 683, their testimony was not conclusive against the plaintiff. In the case cited the headnote reads:

"A party must be held to have believed each witness called by him credible, and to have so represented him to the court. A referee has a right to find a witness mistaken, and, if there is a contradiction between him and another, to decide the question of fact contrary to his statement. But he cannot judicially deem an uncontradicted witness, testifying against the party calling him, false and perjured, and, so holding, to infer the truth of the matter to be the reverse of what was testified."

The opinion of the court is not given; but, if we accept the syllabus as a correct report of the decision, a subsequent and better considered adjudication by the same tribunal relieves the plaintiff of the embarrassment in which he is supposed to have involved himself by calling the defendants as witnesses.

In Becker v. Koch, 104 N. Y. 394, 10 N. E. 701, the litigation, as here, was as to the validity of an assignment for the benefit of creditors. The party challenging the assignment produced the assignor as a witness. The witness deposed to facts from which the inference of fraud might properly be drawn, but, upon cross-examination, he gave an explanation of the transaction, which, if true, was sufficient in law. Held, "that the witness was to be regarded as adverse to the party calling him, and the same credit was not necessarily to be given to the testi-

mony against such party as to that in his favor; and that it was a proper question for the jury as to what degree of faith should be given under the facts of the case to the explanatory testimony." It had been ruled below that the explanation by the witness, being uncontradicted, was conclusive upon the party calling him; but the court of appeals repudiated the proposition with emphasis, and, for the error, reversed the judgment. To the argument that, by calling the witness, the party presented him to the jury as worthy of belief, and so could not discredit him without practicing deception upon the court, it was answered by Peckham, J., that "in such a case as this there is no deception. The defendant calls the very man he accuses of the fraud as a witness to prove it, and says, in effect, to the jury, that such evidence as the witness gives which tends to prove the perpetration of the fraud alleged is forced upon him by the exigencies of the case and the sur-. rounding facts, which cannot be denied, while that which he gives that looks towards an explanation of the fraud the jury shall give such faith to as, under all the facts in the case, they may think it entitled to."

Notwithstanding, therefore, the testimony of the assignors, called by the plaintiff, to the fact of the firm indebtedness of $23,000 to Mary C. Clapp, the inquiry is open whether, upon other evidence in the case, that alleged debt be not in fact a fabrication and a fiction. The loan by Mary C. Clapp rests upon the testimony of her husband alone. If there was no such loan, the assignment is confessedly fraudulent; and, if it be set aside, Mrs. Clapp will be compelled to restitution of over $7,000. Here, in addition to the ordinary bias of a husband in favor of his wife, a special interest operates upon the witness in discredit of his testimony. "Dealings between husband and wife which result in the appropriation of the husband's property for the payment of a debt claimed to be due to the wife, to the exclusion of other creditors, furnish uncommon opportunities for the perpetration of fraud, and should be carefully and rigidly scrutinized." Manchester v. Tibbetts, 121 N. Y. 219, 222, 24 N. E. 304; White v. Benjamin, 150 N. Y. 258, 265, 44 N. E. 956. These, then, are the facts apparent upon all the proof: That in 1887 Mrs. Clapp sold a house in Chicago, which her husband had given her, for about $23,000, which she lent him, and which he put into the co-partnership of Clapp & Co.; that no written evidence of the loan was ever in the possession of Mrs. Clapp, or existed anywhere or in any form; that upon the books of Clapp & Co., composed of the husband and his employé (the firm by which the $23,000 is said to have been originally received), no trace of the transaction is apparent; that the loan was transferred to a successor firm composed of Mrs. Clapp and her son, and here, too, no record of the loan was made; that the loan was shifted to still another firm, composed of father and son, these assignors, and their books again exhibit no sign of its existence, although showing due entry of Mrs. Clapp's credit on her "speculation account." Nor does the debt of $23,000 to Mrs. Clapp appear in schedule or inventory among the liabilities of the firm. Meanwhile, from 1887 to 1896, not a dollar of the pretended debt, principal or interest, was ever paid to the pretended creditor, nor did she ask for any payment; and when eventually, under the

urgency of the impending assignment, she received $7,000 from her son, it was delivered in bills, to the end, manifestly, that upon the books of the firm no vestige of the dealing with the wife should be revealed to assignee or creditor.

Surely, the evidence is of efficacy in counteracting the testimony of the assignor to the loan by his wife. The omission of any entry of the loan in the books of the firms is of itself persuasive proof against the fact of the loan. Loos v. Wilkinson, 110 N. Y. 195, 212, 213, 18 N. E. 99; White v. Benjamin, 150 N. Y. 258, 44 N. E. 956. "The operations of business men are entered in their books, and payments are made by checks rather than by bills, and it is only when it is deemed desirable that the transaction should not be traced that bills are resorted to." Van Brunt, P. J., in Smith v. White (Sup.) 2 N. Y. Supp. 855, 858. "It was for the trial court to say whether the inference to be drawn from the books was sufficiently strong to overcome the direct oath of the assignor, and thus prove fraud." Ingraham, J., in Manufacturing Co. v. Seale, 3 App. Div. 515, 518, 38 N. Y. Supp. 307. If anything be wanting to the weight of the evidence against the alleged loan, it is supplied by the failure of the assignors to produce Mrs. Clapp at the trial. If she made the loan, her testimony to the fact would have been decisive. But, although living with the assignors, her husband and son, and, of course, identified with them in feeling and interest, they did not venture to offer her as a witness. "In case a litigant fails to produce a person known to be friendly to him and to his cause, who is so situated that he must have had knowledge of the facts in issue, the jury is permitted to presume that the testimony of that person would not have been favorable to the party." Milliman v. Railroad Co., 3 App. Div. 109, 39 N. Y. Supp. 274. "A weak case for the plaintiff is made strong when a witness who could contradict it is not called by the defendant." Byrne v. Railroad Co. (City Ct. Brook.) 26 N. Y. Supp. 760; Carpenter v. Railroad Co., 13 App. Div. 328, 330, 43 N. Y. Supp. 203. Assuming, however, the fact of the loan by Mrs. Clapp, the explicit and uncontradicted proof is that it was made to Clapp himself, and not to the firm of which he was a member. This is his testimony:

"Q. In the year 1887, did Mrs. Clapp lend you any money? A. Yes, sir. Q. How much did she lend you? A. Something like $23,000. * * * She sold some property in 1886, which she collected for in the early part of 1887, and that money I borrowed. Q. Where did you borrow that? A. Here in New York, in 1887."

If Clapp put the money in his firm, it was his contribution of capital, and he still remained the debtor of his wife. When, therefore, he appropriated the firm assets to repayment of the money he borrowed from her, he committed a fraud upon the firm creditors. Bulger v. Rosa, 119 N. Y. 459, 465, 24 N. E. 853; Schwab v. Kaughran (Sup.) 17 N. Y. Supp. 926.

Were the payments to Mr. Clapp made in contemplation of the assignment? Upon the evidence, an affirmative answer to the inquiry is inevitable. With liabilities to the amount of $204,509.59, and assets of only $10,060.55 actual value, the co-partnership of

Clapp & Co., on the 9th of November, 1896, was plainly in a condition of hopeless insolvency. The assignment was made on the 11th of November. On the 7th, Clapp, the father, started for Boston and Chicago, ostensibly to collect money "to tide" the firm over its troubles; yet on the same day he drew from the firm $5,000, $4,494.78 of which he paid to his wife on her "speculative account," and the residue he retained. Nay more, while the father was in Chicago, on the pretense of realizing funds for the firm to avert its collapse, the son transferred to Mrs. Clapp $5,300 of the firm money,—an act necessarily fatal to the firm, and therefore irreconcilable with the professed desire to collect money for its salvation. If the purpose and effort were to continue the business, why did not the assignors leave with the co-partnership this sole resource in its extremity? Obviously, because they foresaw the catastrophe to be imminent and inevitable, and were resolved to rescue from the wreck as much as possible for the benefit of the family. Equally unavoidable is the other inference, that they made the collections, not to keep the co-partnership going, but to wrest every available dollar from the grasp of creditors. On the 9th and 10th of November, the son delivered to Mrs. Clapp $5,300 in "currency." In Chicago the father collected of the firm's creditors between $3,000 and $4,000, a portion of which he expended for his own use, and $2,000 of which was eventually received by his wife. He returned to New York in the morning of the 11th of November, was met at the depot by his son, discussed at breakfast the firm affairs, handed the $2,000 to his son for Mrs. Clapp, and proceeded to his lawyers' office, where he awaited the return of his son from the delivery of the money to his mother, and where, within a couple of hours after that delivery, the assignment in controversy was executed. The collection in Chicago was not disclosed to the assignee, nor entered upon the books of the co-partnership, but the debt appears on the face of the assignment as still unpaid. It is impossible for a rational mind to resist the conclusion that the payments to Mrs. Clapp were made in contemplation of the assignment, and were intended to defraud the creditors of the co-partnership. "Where conveyances are attacked for fraud, and there are many facts surrounding the case which cast suspicion upon the transaction, the defendants should be prepared to meet the allegations of unfairness; and, if they fail to do so, the plaintiff will be entitled to the benefit of all the unfavorable inferences which may legitimately be drawn from their neglect and the general features of the case." Newman v. Cordell, 43 Barb. 448.

Judgment for plaintiff, with costs.