(27 App. Div: 3.)

### FELDSTEIN v. RICHARDSON et al.

(Supreme Court, Appellate Division, First Department. March 11, 1898.)

1. ASSIGNMENT FOR BENEFIT OF CREDITORS—FRAUD.

While an insolvent debtor who is about to make a general assignment for the benefit of his creditors may, under certain circumstances, act innocently in withdrawing an unimportant sum of money, and may not thereby invalidate the assignment, yet the reservation of such a substantial sum as even $450 is some evidence of fraud in the assignment.

2. SAME—CONVEYANCES TO RELATIVES.

While it is true that people in business may commit frauds upon those who deal with them, and yet in the end assign their entire estate for the benefit of their creditors, yet when it appears that a business is fraudulently con-

ducted down to the very hour of the assignment, and that large parts of the debtor's estate have been transferred to relatives under very suspicious circumstances, such facts must be considered upon the question of the intent with which firm moneys were withheld from the assignee.

**3. SAME—EVIDENCE.**

Acts of an assignor for the benefit of creditors, against which charges of fraud are made, are not to be segregated and treated independently, but should be considered in their relation to each other, and as parts of the assignor's general purpose.

Appeal from special term, New York county.

Action by Arnold Feldstein against Briton Richardson and others. From a judgment for plaintiff, defendants Richardson and Oscar R. Meyer appeal. Affirmed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, McLAUGHLIN, and INGRAHAM, JJ.

Carlisle Norwood, for appellants.

James L. Bishop, for respondent.

BARRETT, J. The judgment appealed from sets aside as fraudulent a general assignment for the benefit of creditors made by the defendants Jane Macfarlane and William W. Macfarlane, composing the firm of William Macfarlane & Co., on the 27th day of April, 1896. On the morning of the day when the assignment was executed, and plainly in contemplation of the act, Mrs. Macfarlane cashed four checks, aggregating $1,770. Three of these checks, amounting to $1,470, were drawn on the firm bank account; and the fourth, for $300, was drawn on the bank account of the National Silk Label Company, a corporation the entire capital stock of which was owned by the assignors, and which had shortly prior to the assignment transferred all of its assets to the firm. It is contended that the greater part of these sums was subsequently paid to firm creditors; but, concededly, $450 was devoted to the private and personal uses of the assignors, and $500 was paid for interest on mortgages upon real estate, the legal title to which was in Mrs. Macfarlane's daughter, Mrs. Simes. The evidence certainly justified a finding that the assignors, in contemplation of insolvency, deliberately withdrew a substantial sum of money from the funds of the firm, and withheld it from the assignee. Such an act may not be per se fraudulent, as matter of law. Whether it is fraudulent or honest is generally a question of fact, depending somewhat, of course, upon the importance of the sum reserved, but principally upon the intent of the insolvent debtor. It has been held, in reviewing a ruling upon a similar question, that an unimportant sum of money may, under some circumstances, be withdrawn innocently, and without invalidating the assignment. Fay v. Grant, 53 Hun, 44, 5 N. Y. Supp. 910; Id., 126 N. Y. 624, 27 N. E. 410; Manufacturing Co. v. Schwarz, 3 App. Div. 298, 38 N. Y. Supp. 368. But the reservation of such a substantial sum as even $450 is certainly some evidence of fraud in the assignment; and we know of no case where a finding of fraud based upon such a reservation, intentionally made for personal enjoyment, has been reversed on appeal. In many cases such a withholding of assets has been held to justify the setting aside of the assignment. Coursey v. Morton, 132 N. Y. 556, 30 N. E. 231; Constable v. Hardenbergh, 4

App. Div. 143, 38 N. Y. Supp. 694; Rothschild v. Salomon, 52 Hun, 486, 5 N. Y. Supp. 865; White v. Benjamin, 3 Misc. Rep. 490, 23 N. Y. Supp. 981. It is true that in this respect each case depends upon its particular facts. The reservation must always be viewed in the light of the surrounding circumstances. In the present case, however, the assignors' explanation is but a confession of guilt, for it is clear upon Mrs. Macfarlane's own testimony that she deliberately intended to apply, partly to her personal use, and partly to such other uses as she deemed fit, this entire sum of $1,770.

Not only is the application of the money not satisfactorily explained, but it is coupled with many suspicious circumstances. The evidence shows that the firm was in a failing condition during the whole of the year 1896. It had, in fact, for a long time, been actually insolvent. In spite of this, its purchases of goods were nearly double what they had been previously. These additional orders were not due to a legitimate demand for the goods. On the contrary, the market was poor, and the goods were largely turned over to creditors as security for debts. Over $14,000 worth of goods were purchased from the plaintiff, Feldstein, and at once pledged for much less than their cost price. In February, 1896, the assignors issued a statement purporting to show their financial condition on the 15th of that month. It was grossly inaccurate and deceptive, and Feldstein was induced to deliver his goods on the strength of it. Their books of account were imperfect and misleading, so much so that expert accountants were wholly unable to unravel the transactions of the firm. On February 25, 1896, they deeded a valuable piece of real property, known as the "Steinhardt Flats," to Mrs. Macfarlane's daughter, Mrs. Simes; and on April 22, 1896, two chattel mortgages were made,—one by the firm to Mrs. Macfarlane's son Arthur, for $3,510, and one by the National Silk Label Company, for $1,633, to Mrs. Simes, as guardian of her son. None of these instruments were recorded till the day of the assignment. On April 22d, also, Mrs. Macfarlane applied for a loan, and, in doing so, gave assurances that she had not secured any creditor, when in fact the deed of the flats to her daughter, and a deed of property in Yonkers to another creditor, had already been made, and she had either made, or was contemplating making, the two chattel mortgages. It is said that the deed of the flats was made under an agreement with Mrs. Simes that she should sell the property, pay herself a certain sum due to her, and return the balance; but this agreement was entirely oral, and the arrangement was an apt one to defraud creditors. The mortgage to Arthur Macfarlane was to secure an alleged debt for services, to which the books of the firm contain no reference, and which, according to the defendants' testimony, had been accruing during a period of nearly five years, without liquidation in the interim either in whole or in part. Nor was the alleged debt of the firm to Mrs. Simes' son satisfactorily established. It is based upon the improbable premise that Mrs. Simes took her son's money, and lent it, in breach of her trust, to a firm of which she was not a member. But the evidential data further weaken the claim. It appears that Mrs. Simes had for years collected the rent of the flats, and had given a large number of checks to the firm in settlement of this and other

complicated transactions. From these hundreds of checks, four were singled out as representing her son's money. These were Mrs. Simes' personal checks, and the claim that they represented her son's money is supported merely by the bald statement that the defendants remember that they represented trust funds. These checks do not even fit with the sum inserted in the mortgage, which is less than their total amount,—a singular circumstance when the defendants were attempting to secure the entire debt. We have carefully examined the elaborate explanations and justifications of these various acts and circumstances, and our conclusion is that the trial court was not bound to accept them as sufficient. It may be said, in brief, that the error of the learned counsel for the appellants lies in assuming·that each of the acts against which charges of fraud are made may be segregated, and treated independently, and in demanding implicit credence for the statements of the defendants, when unsupported by documentary evidence and impeached by the surrounding circumstances. These acts should, on the contrary, be treated in their relation to each other,. and as parts of the defendants' general purpose.

It is true that these preceding acts do not necessarily show that the assignment itself was fraudulent. People who are in business may commit frauds upon those who deal with them, and yet, in the end,. assign their entire estate for the benefit of their creditors. But when a business is fraudulently conducted down to the very hour of the assignment, and when, in addition, we find that large parts of the debtor's estate have been transferred to relatives, under, to say the least, most suspicious circumstances, we are bound to consider such facts upon the question of the intent with which firm moneys were withheld from the assignee. The attitude of the present assignors. when they withdrew these moneys, immediately before the execution of the assignment, was very different from that of honest, but·unfortunate, debtors, who at such a moment mistakenly apply a small sum to their immediate personal needs. We feel bound here to sustain the decision of the learned trial judge, to the effect that the withdrawal of the moneys in question was not only fraudulent in itself, but was really the culmination of a series of acts done with the intention of defrauding the creditors of the firm.

The judgment should be affirmed, with costs. All concur.