## MORRISON *a.* GARNER.

*New York Common Pleas ; General Term, December, 1858.*

FRAUDULENT PURCHASE.—CONCEALMENT OF INSOLVENCY.

The defendant, who was accustomed frequently to purchase from the plaintiffs, for cash, bills of exchange for remittance to Europe in his business, becoming insolvent, procured them to sell him bills to a large amount upon credit, concealing his insolvency, though making no direct false representations as to his condition, or the use to which he should put them; and he then sold these bills in the market.

*Held,* that the circumstances being such as to show that he purchased the bills with intention to make such use of them, and knowing his inability to pay for them, the purchase was fraudulent, and that he was liable to arrest in an action for their value.

Appeal from an order denying motion to vacate an order of arrest.

The facts are stated in the opinion.

By THE COURT.*—DALY, J.—Upon the evidence before him, the judge below was warranted in drawing the inference that the defendant fraudulently contracted the debt; that he purchased the draft with a knowledge that he was at the time insolvent, and would not be able to pay the amount at the expiration of the credit, unless he applied the proceeds derived from the sale of the bills to that purpose.

The bills were sold to him upon the assumption, from the usual course of his business, that they were to be used by him to remit funds to Europe; but on the contrary, according to his own statement, he sold the bills in this market, as he alleges at a profit, but does not disclose in his affidavit the name of the person or firm to whom he sold them, or what he did with the proceeds. When the bills were offered for sale by the broker, he took a day to consider whether he could make use of them, though he had frequently purchased bills of the same drawers

---

* Present, DALY, F. J., BRADY and HILTON, JJ.

and indorsers from the broker, and was in the habit of deciding at once as to their purchase. On the next day, the 25th of September, 1857, he announced that he would take the bills upon the terms of paying for them in cash on or before the 20th of October following; which was agreed to, and the bills were sent to him, which was the first occasion of his purchasing bills of this description from the broker upon credit. When they were delivered to him, he was in the office of his brother, of the firm of Garner & Co., which office adjoined and communicated with his own, and was engaged in close and earnest conversation with his brother; and the witness testifies that his manner was excited and flurried. At that time he was closely connected with his brother's house,—being, according to his own statement, indebted to them in the sum of $600,000, against which they held securities estimated by them at $400,000, but by him at several hundred thousand dollars more than the amount of Garner & Co.'s claim; which securities, according to the testimony, have not depreciated since that time, but have actually appreciated in value between the time that the defendant's failure was announced and the time when he executed his assignment. On the day after the defendant bought these bills, the house of Garner & Co. failed; and on the day, or a day or two after that event, when the defendant was applied to to cash the bills, he told the plaintiffs' agent that the price of the bills was as safe as if the plaintiffs had the money in their own pockets. He swears that when he bought the bills the day before the failure of his brother's house, he had no intimation or suspicion that that house would have to suspend, and that the first intimation he had to that effect was on the day after their failure,—a statement improbable upon its face, and in respect to which I think the judge below was justified in disbelieving him, as he was involved in large transactions with that house. They had supplied him with exchange the month previous to the amount of forty thousand pounds; and it was in evidence that, for some days before the failure of Garner & Co., it was a matter of public notoriety among business men that that firm was in difficulty, and would be likely to fail.

He swears that the failure of that firm affected his credit, and that the large amount of securities held by them and by him became so depreciated by the crisis, that he was compelled to

suspend twenty-three days after. But the witnesses of the plaintiff testify that there was no material depreciation in securities between the time of the failure of Garner & Co. and the failure of the defendant; and if the defendant wishes the court to believe, after this evidence on the part of the plaintiff, that his condition was unexpectedly and materially changed by the failure of his brother's house,—that his failure sprang from causes of which he had no knowledge when he bought these bills,—he should have specified or indicated some of the securities held by his brother's house and by himself, the rapid depreciation of which brought about his failure so unexpectedly; the more especially when it is in evidence that there was a rise in the value of securities between the time of his suspension and the time of his assignment. He swears that he was disappointed, on the 14th of October, in effecting an arrangement for some £20,000; and that as financial matters and securities became worse and worse, and more depreciated after the 28th of September, he was compelled on the 17th of October to yield to the pressure of the times. In the statement as to the condition of the times, and the general depreciation of securities between the periods indicated, he is contradicted by the other witnesses; and the impression made upon my mind by the testimony is, that nothing occurred to cause his failure, from the time he purchased the bills until he suspended, that he did not know and anticipate when he bought them.

The day's deliberation before concluding the purchase—the purchase of them upon credit, contrary to his usual business custom—the omission to enter the transaction in his books—the fact that he did not purchase them to remit to Europe, but that he might sell them again in the market here—and his silence as to the name of the person or firm to whom he sold them, and as to what he did with the proceeds—are all circumstances justifying the conclusion arrived at by Judge Ingraham, that he purchased them fraudulently.

His attempt to explain why he did not have the purchase entered in his books is unsatisfactory. It was in evidence that it is the universal custom among merchants to make entries in their books of the purchase or sale of bills of exchange as soon as they are purchased or sold; and it would be apparent without this evidence that it is unmercantile, and strongly suspicious,

to make no entry of a purchase upon credit, and of a subsequent sale, in a transaction involving an amount of over $23,000, in the conduct and management of so large a business as that conducted by the defendant. That the defendant so regarded it is evident from his declaring to the plaintiff's agent, more than twenty days after the sale, that the transaction was entered in his books; whereas, now, he swears in his affidavit that it was not his business custom to make any entry of such a transaction until he knew whether the bills would be accepted or not. His present explanation of the omission, therefore, is not consistent with his previous declaration, and the inference that it warrants must be taken against him. It was also in evidence that the bills sold by the plaintiff were of the first class, and that the defendant could not have sold them here again at a profit. If the facts were otherwise, it was an easy matter for the defendant to disclose the name of the person or firm to whom he sold them, and the amount for which they were sold; or, if he wished to put the matter beyond contradiction, to get the affidavit of the purchaser as to the fact. He has not thought proper to do this, or to avail himself of the privilege granted him by the judge, of renewing his motion upon further affidavits, if he could explain or avert the conclusion that must arise upon the facts as they are now presented, but has appealed from the judge's decision.

That decision was in my judgment correct, and the order below should be affirmed.

---

## BOGARDUS a. LIVINGSTON.

*New York Common Pleas; General Term, December,* 1858.

ATTORNEY AND CLIENT.—RETAINER.—SERVICE.—MOTION TO VACATE JUDGMENT.

An attorney, being employed by his client in the prosecution and defence of many suits, gave a voluntary appearance for him in a new suit brought against him upon a subject connected with suits then pending. About the time of