GEORGE L. MEACHAM *et al.* Appellants, *against* AUGUST M. COLLIGNON (Impleaded), Respondent.

(Decided January 7th, 1878.)

Where the defendant was a creditor to a large amount of his nephew, who was engaged in buying goods on credit and shipping them to Europe for resale, and the nephew had no funds of his own but relied for funds to pay for the goods he purchased, on money advanced to him by the defendant, in whose name the bills of lading were taken, and after a number of such purchases, shipments and advances by the defendant had been made and there had been a loss on the shipments so that the defendant had not received back his advances in full, a large quantity of goods were purchased on credit and shipped and the bills of lading made out to the defendant, who made no advances thereon but collected the proceeds of sale and applied them to the balance due for former advances and on account of an old debt due to him from his nephew,—*Held*, that these facts were sufficient to show that the defendant's nephew bought the goods with the fraudulent design of never paying for them, and that the defendant had knowledge thereof.

Where the third party receiving goods has guilty knowledge of the fraud by which they were obtained, no notice of rescission of the sale need be given him by the person defrauded before action brought ; a simple demand for the goods is sufficient.

An action for the wrongful detention of the goods, or for their value, will lie

against the person receiving them from the fraudulent vendee with knowledge of the fraud, although such person may have parted with the goods before action brought. *Roberts* v. *Randel*, 3 Sand. 707, distinguished.

APPEAL by plaintiffs from an order of the court made at special term by Judge LARREMORE, granting the defendant, Collignon, a new trial.

The action was brought to recover from defendants possession of 200 barrels of apples, or if possession could not be had, for $800, .the value thereof, and damages. Plaintiffs claimed that the apples had been procured from them by Campbell by fraud, and delivered by Campbell to Collignon without consideration and with notice on the latter's part of the said fraud. The jury found against both defendants; but a motion for a new trial upon the minutes of the judge was made by Collignon, and subsequently granted on the ground that the verdict as to him was against the evidence.

*Cheevey & Clark*, for appellants.

*Robert W. Todd*, for respondent.

JOSEPH F. DALY, J.—I have seldom known the verdict of a jury upon a question of fraud in a mercantile transaction to be without good legal evidence as well as sound legal inferences to sustain it. The shrewd common sense of the men in the jury box can hardly lead to wrong conclusions in a matter so wisely left by law to their determination. The present case is no exception to the rule that jurors are the best judges of the facts—especially where, as in nearly every case of fraud, these facts are to be gathered from a variety of circumstances and are seldom susceptible of direct proof.

Campbell was a dealer in apples and produce in the basement of No. 298 Washington street, where he had been in business some three years. In November, 1875, he was indebted to his uncle, Collignon, to the amount of about $2,000. Along about the latter part of November or first of December, 1875, he went to his uncle and said he would like to

ship apples to Europe, and asked if his uncle would make advances on the bills of lading if he would turn the bills over him, ship the apples in his name, and allow his carts to do the shipping at the usual market rate; Collignon said he would do so and put the apples on ship and make an advance on each shipment; each shipment to cover advances made on it specifically and to secure or cover losses on account of advances made on prior shipments; the advances were to be about the New York prices and to be made sometimes on delivery of the goods and sometimes in ten days. At the outset, this arrangement and the circumstances surrounding it support the conclusion that Collignon knew that his nephew must obtain the apples to ship on credit, and must pay for them out of the advances, which, for the purpose of enabling such payment, were to be "about New York prices;" also, that Collignon was aware that he and Campbell were thus engaging in a speculation with property obtained on credit, and that whenever it became necessary under their agreement that he should hold a shipment to cover losses on prior shipments, he was simply making himself secure on his own speculation with property obtained on trust and on a credit fostered by his own acts. With provision thus made against the future and possible loss in the business, by a reserve of other people's goods, active operations were commenced and continued until Campbell "failed" about March 6th, 1876, a period of about four months. During this period, beginning with 50 barrels of apples on December 14th, 1875, and ending with 175 barrels on March 3, 1876, Campbell turned over to Collignon 3,175 barrels, on which there were advanced to him: cash, $5,559 28; in merchandise, $2,680 80; cartage charges, etc., $251 95; making a total of $8,492 03. The net proceeds of the apples was $9,564 94, leaving a balance of $1,072 91, which Collignon has applied on the old indebtedness of $2,000 existing from Campbell to him before these transactions began. Notwithstanding the balance thus left in Campbell's favor and applied by Collignon on the old debt, it must not be supposed that the apple venture was a suc-

cess ; in fact there was a dead loss of $2,447 28, the net cost of the 3,175 barrels being $11,756 66, and the net proceeds, as we have seen, but $9,564 94. The explanation of Collignon's coming out of the transactions with his advances paid up and a balance to apply on the old debt is found in the fact that on the last four shipments, amounting to 875 barrels, he made no advances at all, but applied their proceeds to cover losses on the prior shipments under the provision of the agreement between Campbell and himself to that effect. The plaintiffs in this action find themselves, to the amount of 200 barrels, among the victims selected to make up Collignon's deficiency when it became necessary for him and Campbell to protect him from loss. His last advance was made on February 15th, on 200 barrels; he received on the 18th, 200 barrels more; on the 22d, 200 barrels ; on the 26th, 300 barrels, and on March 3d, 175 barrels.    These were made up from purchases by Campbell from the plaintiffs on February 18th and 25th,—100 barrels on each date,—and from purchases of 963 barrels more at various dates from February 16th to March 3d, and from eleven different vendors.    These purchases were all for cash and have not been paid for.    There was, besides, at the time Campbell obtained them, no means or prospect of paying for them, except from advances which Collignon might make upon them.    If they were purchased by Campbell with the intention of merely turning them over to Collignon. to make the latter safe on his general account for advances, and therefore with the knowledge that he could not and would not pay for them, they were procured by fraud; and if Collignon received them with notice or knowledge of that intention and design on Campbell's part, or received them in pursuance of a scheme involving the perpetration of just such a fraud, he is not a *bona fide* purchaser and acquired no title to them.    On March 6th, three days after the last shipment, Campbell announced to such of his creditors as sought him to demand payment, that he had not been able to obtain advances on the shipments because of heavy losses on prior shipments.    At how early a date Collignon knew there were

heavy losses on prior shipments does not directly appear. He knew it when the last shipment was made to him (March 3d), because he then, according to Campbell's testimony, refused advances on the last four shipments, on the ground of "heavy losses on the last four shipments." He probably knew it on March 2d, for on that day Campbell gave him a check for $175, thus exhausting his bank account except a balance of less than two dollars. It is probable that he knew it before, if the evidence is not conclusive on that point, for his own accounts show that out of the fifteen shipments from December 14th to February 12th there was a loss on thirteen of them, amounting to $1,601 24, and a profit on but two, amounting to $71 18. Up to the February 5th shipment there had been but one profitable venture, netting $56 46, and a loss on all the others amounting to $905 97. There was enough in this account to justify the jury in finding that according to the course of commercial transactions Collignon knew on February 18th that he was largely behind on his ventures, and that a considerable amount of goods must be procured to save him from ultimate loss. Between the 18th and the ensuing 3d of March, therefore, we find him receiving 875 barrels of apples, taken by his own carts direct from the vendors, having been procured for him on and between those dates by Campbell, and shipped without any advances. These shipments, at cost, in New York, amounted to $3,357 88; sales of them show a net loss of $370 37; thus yielding him sufficient to balance his account for advances and to credit, in addition, a balance of $1,072 91 on his nephew's old indebtedness.

On these facts I deem the conclusion reached by the jury a sound one, and think their verdict should not have been disturbed, because it was manifest that Campbell bought the goods from plaintiffs with the preconceived intention of not paying for them but of putting them into Collignon's hands to cover prior losses; and Collignon had distinct notice of the fact when he got them.

Not being a purchaser in good faith nor for a valuable consideration, but a transferee with full knowledge of the

fraud, Collignon cannot hold the goods for prior advances, no matter how reasonable and usual (in fair cases) such an agreement as he made with Campbell to that effect might be ; nor is he entitled to any credit for cartage and other expenses, but is bound to return the goods or their value to the wronged vendors rescinding the sale, without any deductions or credits to him whatever. A naked demand of him was proper without any tender and without setting forth grounds for the demand or giving notice of rescission. These requirements or formalities are necessary only in cases where there is no pretence that the transferee of the fraudulent purchaser has guilty knowledge. (*Bliss et al.* v. *Cottle,* 32 Barb. 322 ; *Keyser* v. *Harbeck,* 3 Duer, 373.) The action was properly brought for the wrongful detention of plaintiff's goods, and for the recovery of the goods or their value. Plaintiffs were not bound to know that Collignon had shipped the apples before suit was brought ; they saw them taken by his carts, and the fact that he shows a parting with the possession to others before demand will not defeat the action. The authority quoted by defendant's counsel on this point (*Roberts* v. *Randel,* 3 Sand. 707) refers to a complaint in which it is distinctly averred that defendant had parted with the goods several months before suit was brought ; and yet the specific property was claimed, a requisition issued for it, an order of arrest issued for "concealing or disposing of it so that it could not be found by the sheriff," which order was set aside. In this case the possession of the goods was alleged to be in defendant ; if he show they are not, he is still liable for the value if possession cannot be restored.

Defendant raises a last question on the well known rule of law that a party defrauded must rescind at the earliest practicable moment ; and insists that the delay of 30 days by plaintiffs before making demand is fatal. The rule as to prompt notice of rescission is only applicable where the party electing to disaffirm has received some benefit or advantage under the contract, which he enjoys as long as he pleases and then attempts to throw up in the hope of obtain-

ing greater advantages (*Masson* v. *Bovet*, 1 Denio, 69 ; *Bruce* v. *Davenport*, 1 Abb. Ct. App. Dec. 233), or where the position of the parties has so changed during the delay of the person entitled to rescind as to make it inequitable to permit his final election to disaffirm. This case presents no such features. Plaintiffs got nothing by the contract they were induced to enter into by the fraud of Campbell ; and Collignon, if he had sold the apples during the 30 days' delay of plaintiffs to demand them, still had the proceeds.

On all the points I am in favor of reversing the order for a new trial, with costs.

CHARLES P. DALY, Ch. J., concurred.

Order granting new trial reversed, with costs.