(3 Misc. Rep. 490.)

## WHITE et al. v. BENJAMIN et al.

(Superior Court of New York City, Equity Term. May 19, 1893.)

1. FRAUDULENT CONVEYANCES—JUDGMENTS—ACTION TO SET ASIDE.

In an action by judgment creditors of B. to set aside a judgment in favor of and certain conveyances to his wife, it appeared that plaintiffs' judgment was for a large sum, which had been owing by B. for several years to their deceased father, and that, after suit was brought therefor, B. and his wife procured an attorney who had an office with B.'s attorneys to bring suit against B. in her favor on a note for a sum greater than the amount of plaintiffs' claim. Nothing further was done in the latter suit for two years while the former suit was pending in the supreme court on exceptions, which were overruled. Thereupon affidavit of service in the wife's suit was sworn to, and negotiations for settlement of plaintiffs' suit undertaken. On the same day that such negotiations failed, two days before plaintiffs obtained judgment, the wife took judgment in her suit, and a general assignment by B. was executed. The latter was filed on the next day. Two days before the maturity of the note to plaintiffs' father, B. conveyed all his land within the state to his wife by a deed which was not delivered until three years thereafter, and was not recorded until the day before plaintiffs recovered judgment. About six months before the latter date he also made deeds to her which were not recorded, of considerable land in another state. These conveyances were without consideration, and B. remained in possession and received the rents. Five months previous to the judgments, when B. claimed he was insolvent, he gave his wife over $5,000. *Held*, that the judgment in favor of B.'s wife and the conveyances to her were fraudulent.

2. ASSIGNMENT FOR BENEFIT OF CREDITORS—VALIDITY—OMISSION OF ASSETS.

In an action by creditors to set aside a general assignment it appeared that contemporaneous therewith the assignor aided his wife to obtain a fraudulent judgment against him for a large sum, and that previous thereto he had made voluntary conveyances of valuable property to her, and only a short time before gave her over $5,000. He also omitted from the assignment a bank account and other money amounting to $1,463, and an endowment policy on which he had paid the premiums, valued at $1,568. *Held*, that the assignment was void.

Action by Eliza W. White and Caroline White against Edward M. Benjamin and Anna Byron Benjamin, his wife, and Cyrus V. Kean, assignee for benefit of creditors of Edward M. Benjamin, to set aside as fraudulent (1) the assignment, (2) a judgment in favor of Benjamin's wife, and (3) certain conveyances to the latter from her husband. Judgment for plaintiffs.

Whitlock & Simonds, (W. C. Beecher, of counsel,) for plaintiff.
Henry H. Klamroth, for defendant E. M. Benjamin.
L. S. Tenney, for defendant Anna Byron Benjamin.
Smith & Dougherty, (John E. Parsons, of counsel,) for assignee, Cyrus V. Kean.

McADAM, J. An owner of property having the jus disponendi may undoubtedly make any disposition of it he chooses, but the rule is subject to the exception that, if he has creditors who are prejudiced by the disposition, they may challenge the propriety of the disposition, and, if it be made to appear that it was made with intent to hinder, delay, or defraud them, and stands in the way of

the collection of their lawful demands by the ordinary process of law, they may file a bill in equity to remove the obstruction, and this may be done by a decree of the court declaring the disposition, no matter in what form made, fraudulent and void as to such creditors, who are thereafter allowed to enforce their judgments as if no such obstacle had ever been placed in the way of collecting the same. It appears that the plaintiffs recovered a judgment against the defendant Edward M. Benjamin on April 21, 1892, for $121,342.01, and issued execution which was returned wholly unsatisfied. The action in which the judgment was recovered was brought on a promissory note for $100,000, executed by the defendant Edward M. Benjamin to the order of the executor of the estate of James L. White, the father of the plaintiffs, dated January 1, 1885, and due July 3, 1886, which note had been given in renewal of a similar note dated January 1, 1884, to the order of said James L. White. White died in May, 1884, and for that reason the renewed note was made payable to the order of his executor. These dates are material for the purpose of showing when the plaintiffs became creditors of Benjamin, and how his acts subsequently to the creation of their debt impaired and defeated the remedies provided by law for its collection.

The action brought by the plaintiff on the $100,000 note was begun in December, 1889, and was tried in October, 1891, before Mr. Justice Freedman, who directed a verdict for the plaintiffs, and ordered the exceptions to be heard in the first instance at the general term. The general term, on April 11, 1892, overruled the exceptions, and directed judgment to be entered for the plaintiffs on the verdict. 18 N. Y. Supp. 956. On May 6, 1890, a few months after plaintiffs had begun their suit, an action was brought by Mrs. Benjamin against her husband upon a promissory note for $114,380.67, alleged to have been made by him to her on December 31, 1887, payable in 30 days. The summons and complaint in that action were served on the husband on May 6, 1890, the wife's attorney occupying the same office as the husband's attorneys. The complaint was verified on the same day it was served, and Mr. Benjamin accompanied his wife to the lawyer's office, where the verification was made, and service effected. No answer was interposed, and nothing further was done in the action until after the decision of the general term in the plaintiffs' suit, when, on April 16, 1892, the affidavit of service was sworn to. During the period from April 11, 1892, to April 19, 1892, negotiations were pending between the plaintiffs' attorneys and the attorneys for Mr. Benjamin for a settlement of the plaintiffs' claim, or for securing the judgment on appeal. These negotiations fell through on April 19, 1892, when Mr. Simonds, one of the attorneys for the plaintiffs, met Mr. Dougherty, one of the attorneys for Mr. Benjamin, in the clerk's office, at about 10 o'clock, and told him, as Mr. Dougherty testifies, that the offer of the defendant had been refused. On the same day, and probably subsequent to the interview at the clerk's office, Mrs. Benjamin's attorney swore to the affidavit of regularity in

her action against her husband, and later on the same morning, at 11:46, judgment was entered by default in her favor for $143,-299.12. Execution on this judgment was immediately issued to the sheriff, wherein he was directed to collect the full amount of the judgment, and levy was at once made upon all the tangible property of the defendant. This property only realized on the sheriff's sale a few hundred dollars, but it was all the sheriff could find. As soon as the sheriff had made his levy, Mr. Benjamin made a general assignment to the defendant Kean, such assignment being dated and acknowledged on April 19, 1892, and filed April 20, 1892, at 11:50 A. M. This had been executed by both Mr. Benjamin and Mr. Kean about noon on April 19th, and seems to have been simultaneous with the entry of Mrs. Benjamin's judgment. Mr. Benjamin claims that he was then insolvent, because of his alleged indebtedness to his wife, consisting of the judgment in her favor, and, in addition, a balance of account for borrowed money of $24,-566.16. Mr. White, the payee of the original note, was a personal friend of Mr. Benjamin, and in his lifetime the latter seemed to feel secure. After White's death his executor became more exacting, and then Mr. Benjamin began to strip himself of his tangible property. The making of transfers began. The only real estate he owned in New York, the Christopher street and Greenwich avenue property, he transferred to his wife for one dollar, the deed being dated and acknowledged in July, 1886, within a week of the maturity of the note. It was not delivered, however, until within a few days of the trial of the plaintiffs' action in October, 1889, and was kept off the records until April 20, 1892, the day the assignment was filed. These dates are material to show the close connection between the consummation of the various acts, and as bearing on the question whether they do not evidence part of a general scheme executed at different times in furtherance of one common purpose. In October, 1891, a few days before the trial of the plaintiffs' action, Mr. Benjamin transferred to his wife certain property in South Orange and at Bayonne, N. J., worth $4,000, for the consideration of $1, the South Orange property being incumbered with a mortgage of $3,500, which he subsequently paid off. The deeds of this property have not yet been recorded. Mr. Benjamin, the grantor, remained in possession of all such property, making leases in his own name, collecting and using the rents, paying taxes and repairs, and taking out insurance in his own name. On July 10, 1886, the same day as the transfer of the Greenwich avenue property, he also, as executor of his first wife and individually, transferred the property No. 149 West Thirty-Sixth street, in which he had a life interest, and of which the net rental was about $1,100 per annum, to his present wife, without any consideration; this deed being kept off the records for more than three years, or until November 14, 1889. At a later date, January, 1890, he transferred to her the remaining real estate of his deceased wife, in which he also had a life interest, through Henry H. Klamroth as intermediary, again for the consideration of one dollar, and from

the dates of the transfers of these properties belonging to the estate of his first wife he continued to receive the rentals himself, but charges himself with them in his account with his wife, thereby swelling his indebtedness to her more than $7,000, although, as holder of a life interest, he was entitled to such rents himself. Mr. Benjamin admits that all of these transfers were made when he was insolvent, for he says that, taking into account his indebtedness to his first wife's estate, and to his second wife, and the White note, he has been insolvent since 1884.

Certain conclusions are inferable from these facts: (1) That the withholding of the deeds from record was to hide from creditors, particularly the plaintiffs, knowledge of the fact of the transfers, which act of concealment is in itself a badge of fraud. Talcott v. Levy, (Super. N. Y.) 20 N. Y. Supp. 440. (2) That the defendant Edward M. Benjamin controlled not only the possession and use of the deeds, but the beneficial enjoyment of the property described therein, and that it continued his until it became necessary to have it appear the property of some one else, and that the coercing factors were the plaintiffs. (3) That there was no delivery of possession or continued change of possession, as required by law, nor was there any attempt to comply with these requirements. (4) That the defendant Edward M. Benjamin controlled the proceedings in the action commenced against him by his wife; that the suit was brought to anticipate thereby any judgment that might be recovered by the plaintiffs; that it was permitted to lie dormant until it suited his purpose to put it in the form of a judgment; and that it was put into judgment to aid him in avoiding the consequences of the plaintiffs' judgment. (5) That the different transfers, the action by the wife, the entry of judgment in her favor, and finally the general assignment, were steps taken with such apparent intervals of time between them as was thought would not arouse suspicion, but were, nevertheless, successive acts in the general scheme which resulted in the judgment in favor of the wife, and the general assignment to Kean. (6) Edward M. Benjamin was the agent and attorney in fact of his wife. She acted when and as he acted. When he protected her, he protected himself. In dealing with the entries in the books—transactions with banks, deposits, drafts, and the like—there was but one dominating mind and master spirit, and that was the husband. So with the transfers and the action by the wife, which culminated in the judgment in her favor. Under such circumstances, the language of Judge Grover in Warner v. Warren, 46 N. Y., at page 233, becomes suggestively applicable. "His objects became hers; his frauds were her frauds; and she is responsible therefor, however destitute of any knowledge thereof." Mr. Benjamin had a 20-year endowment policy, payable to himself. He himself paid the premiums. On November 22, 1890, Mr. Benjamin, with the plaintiffs' action pending against him, and being then insolvent, and claiming to owe to his wife a note of over $114,000, on which she was then suing him, turned over to her the sum of $5,084, and concealed the fact from

his creditors. His policy had a surrender value at the time of the assignment, which was $1,567.92. He also withheld from the assignee the sum of $1,363.13, being the balance of his account in the Sixth National Bank; and also a further sum of $100, received for rent. The assignor, in explanation, attributes these errors to innocent and unintentional mistakes, and to want of understanding the real character of the acts; and claims that they do not rise to the dignity of fraud, because such was not contemplated. The explanation might have some weight were it not for the series of mistakes which permeate the books, and for the irregularities which enter into the transfers and the various transactions, and the significant circumstance that all the errors were in favor of his wife, and to the prejudice of judgment creditors, particularly the plaintiffs. The law judges men's motives from their actions, for it cannot enter into the recesses of a man's conscience and interrogate his intents. Acts speak louder than words; and if a party does an act which must defraud another, his declaring that he did not by the act intend to defraud is weighed down by the evidence of the act itself. Babcock v. Eckler, 24 N. Y., at page 632. The court, in Grover v. Wakeman, 11 Wend., at page 225, said:

"A man's moral perceptions may be so perverted as to imagine an act to be fair and honest which the law justly pronounces fraudulent and corrupt; but he is not therefore to escape from the consequences of it."

The policy of the law in regard to general assignments is that the debtor shall devote all his property to the satisfaction of his debts. The nature of the relation created by insolvency requires that the transfer should be of this comprehensive character. Creditors have an equitable claim on all the property of their debtor, and it is his duty, as well as his right, to devote the whole of it to the satisfaction of their demands. The intentional withholding of assets from the assignee has repeatedly been held to be a fraud upon the rights of creditors sufficient to render the assignment void. Shultz v. Hoagland, 85 N. Y. 464; Talcott v. Hess, 31 Hun, 282; Iselin v. Henlein, 16 Abb. N. C. 73; Chambers v. Smith, 60 Hun, 248, 14 N. Y. Supp. 706. In Chambers v. Smith, supra, it appeared that on the day of the assignment the defendant gave his wife, for household expenses, a check for $200. The court said:

"If, therefore, in contemplation of the assignment, the assignor intentionally and for the purpose of putting any considerable portion of his assets beyond the reach of the assignment gave this money to his wife, it would be such a fraud as to taint the whole assignment, and tend to show it fraudulent as against the creditors affected by the withdrawal of the assets from the assigned estate. In the case at bar the withdrawal of the money paid by the assignor to his wife is an act of great significance, and it is difficult to distinguish it from the cases above cited, in which such withdrawal was regarded as evidence of fraud for which assignments were set aside."

In Rothschild v. Salomon, 52 Hun, 486, 5 N. Y. Supp. 865, it appeared that the assignor gave to his wife three days before the assignment $402, which was charged to the household expenses, and the assignment was set aside. The court held that the abstraction

of this money, in anticipation of and in preparation for the assignment, entered into and formed a fraudulent element in a scheme of which the assignment was a part and parcel, and rendered the whole proceeding void.

In Coursey v. Morton, 132 N. Y. 556, 30 N. E. Rep. 231, it appeared that on the eve of assignment one of the assignors drew a check for $963.50, and delivered it to his wife. After the suit had been commenced it was turned over to the assignee. Held:

"The rule is that the intentional withholding and secreting of assets of a substantial value from the possession of the assignee is a fraud upon the rights of creditors, and renders the assignment void."

This upon the familiar principle that every party must be deemed to have intended the natural and inevitable consequences of his acts; and where his acts are voluntary, and necessarily operate to defraud others, he must be deemed to have intended the fraud perpetrated.

From the preceding facts and citations, and without commenting upon the inaccuracies in the books, or the question of compound interest, or the manner of computing it as to yearly rests or otherwise, (matters which do not at present require comment,) it is apparent that the pure administration of justice will not permit any of the fraudulent contrivances by the defendant, or through his agency, to stand in the way of honest creditors in their attempt to enforce just demands. The fraud found is in the beginning and runs through to the end. The various transfers and contrivances had their inception in fraud, were conceived by the husband,—not demanded by the wife,—lead one to one and the same end, and were calculated to reach a certain result,—that which was consummated by the judgment in the wife's favor, and the general assignment to Kean. That they were sufficiently connected to form one complete transaction is evident from their purpose and intent, forming, as they do, links in one chain, part and parcel of one general scheme or design, and that to put the property of the assignor beyond the reach of creditors, particularly the plaintiffs. There was no pressing necessity which required the assignor to make the transfers to his wife, or the numerous provisions for her benefit, except the pressure put upon him by the plaintiffs; and the transfers and provisions were intended to put so much property beyond their reach or that of legal process. They could have no other object. They were designed to secure all to the wife, leaving the other creditors—particularly the plaintiffs—practically remediless. While the separate property of the wife is as much under the protection of the law as that of an entire stranger, transactions between husband and wife, if to the detriment of creditors, must be carefully investigated to prevent fraud. As was aptly said in Hoxie v. Price, 31 Wis. 86:

"On account of the great facilities which the marriage relation affords for the commission of fraud, these transactions between husband and wife should be closely examined and scrutinized, to see that they are fair and honest, and not mere contrivances resorted to for the purpose of placing the husband's property beyond the reach of his creditors."

We will now continue the inquiry whether the judgment and assignment are to be regarded as one transaction. The courts have invariably held that judgments confessed or allowed on the eve of and in view of a general assignment, followed by execution and levy, are part and parcel of one transaction, and that the statute against fraudulent conveyances includes judgments and suits begun, as well as transfers, where the intent is to hinder, delay, or defraud creditors.

Follett, C. J., in Berger v. Varrelmann, 127 N. Y., at page 289, 27 N. E. Rep. 1065, said:

"The words of the section must be construed to embrace all the instrumentalities which failing debtors, in contemplation of a general assignment, voluntarily employ to give preference to particular creditors."

In Spelman v. Freedman, 130 N. Y. 421, 29 N. E. Rep. 765, the action was brought to have a confessed judgment entered in contemplation of assignment declared void, and amounts realized returned to assignee. Demurrer. It was claimed that the complaint failed to allege that the judgment creditors knew of the assignment. Held, (Vann, J.:)

"Whatever is done in connection with or contemplation of the assignment, with the intent to defeat the operation of the statute, falls within the spirit of its prohibition, and should receive the condemnation of the courts. When the assignment is part of a scheme to circumvent the law, and judgments are confessed by the debtor, executions issued thereon by the creditors, and levies made upon the property of the debtor in their behalf as parts of the same scheme, it is the duty of the courts to see that the object of the legislature is not defeated by such acts, which, although not a part of the assignment, are done in contemplation of it, and with the intent of both debtor and creditor to frustrate the statute."

In Bank v. Bard, 59 Hun, 529, 13 N. Y. Supp. 688, Clarke, Radcliffe & Co., being on the eve of failure, confessed judgments to several creditors in amounts exceeding one-third of their assets. The assignment was executed, and withheld until after the judgments had been confessed and execution levied. Held, (O'Brien, J.:)

"These facts, beyond a reasonable doubt, show that the assignment and confession of judgment together constituted a single transaction for the disposition of all the firm's property, then upon the verge of insolvency. They were all drawn and prepared at the same time and the same place, by the same parties, and were executed at substantially the same time. Those acts were undoubtedly the result of a common scheme, by which it was sought to make a disposition of the debtor's property, and therein to give a preference to those to whom the judgments were confessed. * * * There is, therefore, much force in the suggestion that, as the assignment and judgment constituted a single transaction, part of which the court held to be fraudulent, thereby the whole became tainted with fraud. * * * But there is another and distinct ground upon which these judgments must be set aside. * * * Judgments confessed by debtors, about to make an assignment for the benefit of creditors, the effect of which judgment will be to prefer creditors beyond the amount of one-third in value of the assignor's estate, * * * are void if made as part of one plan for the disposal of all their property."

—Citing Abegg v. Schwab, (Sup.) 9 N. Y. Supp. 681. And in a concurring opinion, Van Brunt, P. J., said:

"It is apparent that the confession of those judgments was part of the fraudulent scheme of the judgment debtors, by which they, by means of

another fraudulent judgment, and a fraudulent assignment, sought to defraud their creditors."

"It is true that the judgment creditors were not privy to this fraud, but that does not validate their judgments, because, if a judgment is suffered in pursuance of a fraudulent intent of the debtors, the judgment is void, irrespective of the intent of the creditors."

In Bank v. Seligman, (Sup.) 19 N. Y. Supp. 362, defendants, on the eve of assigning, allowed certain creditors to take judgment against them, (though the judgments were not entered until after the assignment.) Under them they levied and sold practically all of the debtors' property. Held, (O'Brien, J.:)

"The assignor refused to allow these judgments to be entered before the assignment, or to give any preference by judgment. Expressions, however, of this character on the part of the assignors cannot destroy the force and effect of their action. The question presented was whether or not all these transactions were part of one scheme, the effect of which was to create forbidden preferences. If so, under the authorities, the assignments and the judgments must be held to be fraudulent and void. * * * The fact that the judgments were allowed to be taken on the same day, to be entered after the assignment, standing alone, as far as any presumption or inference of fraud to be drawn therefrom, would not be as strong in favor of attacking creditors as judgments on which levies were made on the same day, but which were docketed prior to the assignment. * * * We are of opinion, therefore, that creditors holding bona fide debts, who secured illegal and fraudulent preferences, are not entitled to any benefit by reason thereof, and that where, as in this case, the preferences consist of judgments or an assigned account, money realized thereunder cannot be retained by them."

In Wilcox v. Payne, (Sup.) 8 N. Y. Supp. 407, judgments were confessed shortly before making the assignment for about $30,000, execution issued, and levies made. These exceeded one-third. Held, (Daniels, J.:)

"The inference was warranted that the judgments were confessed, and the property levied upon and sold in this manner to prevent it from passing under the assignment. * * * And it is to be inferred from what in this manner was done and accomplished that the assignors intended thereby to evade and disregard the statute: * * * and it formed an additional circumstance which the plaintiff was entitled to rely upon to set aside this assignment as fraudulent. All that was done at the time appears to have been the result of one general intention on the part of the assignors. * * * Whether the transfer in the manner condemned shall be made direct to the creditors or through the instrumentality of judgments and executions can create no substantial difference. It is as much the forbidden acts of the debtors to secure the transfer, confessed judgments, and executions as it would be to make them directly to the creditors, for the purpose of creating a larger amount of preferences than those permitted by the statute. The disposition of the debtors' estate is equally as liable to be characterized as fraudulent and evasive of the law in the one instance as in the other."

See, also, Abegg v. Bishop, (Sup.) 20 N. Y. Supp. 810, where Van Brunt, P. J., discusses at length the subject of judgments entered or transfers made in connection with an assignment, and holds that, where a transfer is made to a creditor in anticipation of an assignment, such transfer and the assignment are void, even when the transferee is ignorant of the contemplated assignment, unless he is a grantee for a valuable consideration.

Even if it were necessary to show that Mrs. Benjamin had notice of the contemplated assignment,—which has been held, in a case like this, to be unnecessary, (Abegg v. Bishop, [Sup.] 20 N. Y. Supp. 810,)—such notice has been supplied. It is conceded by both defendants that Mr. Benjamin has all along been Mrs. Benjamin's attorney in fact, and still is such attorney under a power which never appears to have beeen revoked. It appears in the most positive manner by Mrs. Benjamin's testimony that she had absolutely nothing to do with her own affairs, but left them wholly in Mr. Benjamin's hands. The conclusion is irresistible from the proof that he held her judgment in abeyance pending negotiations with plaintiffs, intending to have it entered and followed by an assignment if he failed in his negotiations. It is impossible to read her testimony and not come to the conclusion that she was co-operating with him. Why did she sue just when she did, except to be in a position to head plaintiffs off if necessary? Why did she hold the default for two years, waiting the result of plaintiffs' suit, except to use her claim as a protection to her husband? Why were all of these transactions carried on in the same suite of offices, between associated attorneys? Why was her judgment entered promptly within an hour and a half after the failure of the negotiations between Mr. Simonds and Mr. Dougherty, although the appeal had been decided eight days before? Why was the assignment executed at about noon on the 19th of April, 1892, as Mr. Kean says, and then withheld from record until the following day, except to give Mrs. Benjamin time to perfect her judgment, enter the same, issue execution, and secure a levy upon all that could be reached? Can it be possible that these events, so skillfully timed, were mere coincidences, and that neither Mrs. Benjamin nor her attorney had any information of the assignment executed in the same office with him? It may be possible, but it requires more than ordinary credulity to believe it. Mr. Benjamin, in his examination in supplementary proceedings, swears positively that she did know of the contemplated assignment. In Spelman v. Freedman, 130 N. Y. 421, 29 N. E. Rep. 765, the decision related to a confession of judgment which was adjudged void. In Manning v. Beck, 129 N. Y. 1, 29 N. E. Rep. 90, the judgment was after service of process, and the court held that, if the judgment creditor knows that the debtor is insolvent, and the judgment is allowed in contemplation thereof, and with knowledge that the debtor intends to make an assignment, and that it will result in a violation of the statute, it is equally void. These cases had reference to the statute (Laws 1887, c. 503) which provides that in all general assignments of the estates of debtors for the benefit of creditors hereafter made any preference created therein shall not be valid except to the amount of one-third of the assets of the assignor after deducting the costs and expenses of executing the trust. Some of the transfers complained of antedated this statute, but, as they were not used or put upon record until afterwards, and form part of one general scheme, they offend these provisions as much as if they had been

executed simultaneously with the assignment; that is to say, they are to be construed with reference to it, for they were made in anticipation of it. The cases cited show how these different steps or acts of the assignor are to be construed, and are material for this purpose, as well as to show that, if the statute itself (act of 1887, supra) has been infringed in letter or spirit, the transfers are voidable by creditors. The transfers made and contrivances resorted to do infringe that act, and for this reason, among others, are void. While honest preferences were always upheld at common law, upon the ground that the equities of the different creditors were equal, and that the legal title must, therefore, prevail, the policy of allowing them has been severely criticised, particularly by Judge Duer, in Nicholson v. Leavitt, 4 Sandf. 252, 282, and the act of 1887, supra, is a legislative effort to restrain to an extent the evils which prevailed under the former system, and which are clearly stated in Judge Duer's opinion in the case cited.

The judgment in favor of Mrs. Benjamin, though founded on service of process, must for practical purposes be regarded as a confession. It was not a hostile suit, prosecuted against an unwilling suitor. On the contrary, it was a friendly action, commenced with a purpose, allowed to slumber and lie dormant, to spring into activity and vigor if the exigencies of Mr. Benjamin required that course, and his will directed it to be pursued. The crisis came. The suit was made to play its part, and must be treated, as it is, a practical confession of judgment to the wife, preferred over that obtained by a vigilant creditor, after a defense, litigation, and trial. The acts of the defendant Benjamin were evidently intended to hinder, delay, and defraud the plaintiffs, have had this effect, are in violation of the statutes, and must be set aside.

Fraud assumes so many forms and colors that it has defied all efforts at a complete definition, and the proof in each case must depend upon its own circumstances. Fraud may be committed by acts or effected by words. The intent to defraud is an emotion of the mind, and can usually be shown only by the acts and declarations of the party. These and all the concomitant circumstances must be established, and then the motive may be deduced from them in accordance with those principles which are shown by experience and observation to rule human conduct. The proof usually consists of many items of evidence, which, standing detached and alone, would be immaterial, but which, in connection with others, tend to illustrate and shed light upon the character of the transaction, and show the position in which the parties stand, and their motives, conduct, and relations to each other. Although the evidence is generally circumstantial, it is often as potent as direct testimony. Sometimes a combination of circumstances characterizes a transaction so plainly and so clearly as to stamp upon it unerring and indelible marks of fraud which cannot be mistaken, and the transaction itself may present phases so remarkable and peculiar that no fair-minded person can hesitate to pronounce it fraudulent. These indicia are often the clearest proof, and quite

as reliable as positive evidence.　Bump, Fraud. Conv. 560.　Chancellor Kent, in his Commentaries, (volume 2, p. 484,) says that a deduction of fraud may be made from facts, incidents, and circumstances which may be trivial in themselves, but decisive evidence in a given case of a fraudulent design.　Evidence of preparation for an act is admissible to show the quo animo, and the details are material to the same end.　Proof of contemporaneous frauds and covering up of other property to place it beyond the reach of creditors must be received and considered.　Benham v. Cary, 11 Wend. 83; Jackson v. Timmerman, 12 Wend. 299; Cary v. Hotailing, 1 Hill, at page 316; People v. Hopson, 1 Denio, at page 577; Hall v. Naylor, 18 N. Y. 588; Wait, Fraud. Conv. § 282; Hennequin v. Naylor, 24 N. Y. 139; Hersey v. Benedict, 15 Hun, 282.　Contemporaneous acts, within the meaning of the rule, need not have taken place at the same time, so long as the transactions are so connected and similar in their relations that the same motive may be reasonably attributed to all.　This question was considered by the court of appeals in People v. Shulman, 80 N. Y., at page 376, note, in which Judge Earl said:

"It is obviously impossible to lay down any general rule limiting the time within which such transactions must have taken place in order to render proof of them competent. It is generally said in the cases that they must have occurred about the same time as the commission of the alleged crime; but that is quite indefinite, and in some of the reported cases proof of them has been received, although they occurred months before and after the time of the crime. Each case, as to the application of this rule, must depend largely upon its own circumstances, and not unfrequently the limit of them must rest entirely in the discretion of the judge presiding at the trial."

The series of acts before enumerated are like steps in a flight of stairs,—each follows the other in regular order, and, combined, lead to one and the same end.　They evidence one and the same purpose, and must, in like manner, be considered as the consummation of one and the same general scheme.　With respect to the comparative weight due to direct and presumptive evidence it has been said that circumstances are in many cases of greater force and more to be depended on than the testimony of living witnesses, inasmuch as witnesses may either be mistaken themselves, or wickedly intend to deceive others; whereas, circumstances and presumptions naturally and necessarily arising out of a given fact cannot lie.　Per Montgomery, B., in Annesley v. Anglesea, 9 State Tr. 426, 17 How. State Tr. 1430.　Circumstances give rise to presumptions, and these in turn are proof.　In Rex v. Burdett, 4 Barn. & Ald. 161, Abbott, C. J., said:

"A presumption of any fact is properly an inference of that fact from other facts that are known. It is an act of reasoning, and much human knowledge on all subjects is derived from this source. A fact must not be inferred without premises that will warrant the inference; but, if no fact could be thus ascertained by inference in a court of law, very few offenders would be brought to punishment."

The various circumstances linked one to the other form a strong claim of evidence pointing to the common purpose of getting every-

thing in the form of property into the wife's name, and beyond the reach of creditors, and this with the fraudulent intention of defrauding the plaintiffs. Circumstances often betray and manifest the motive of a given act or series of acts; hence intention is frequently inferred from facts established. Ram, Facts, (Townshend's Notes,) pp. 274, 275. Wood, in his work on Practice and Evidence, (page 194, § 70,) says:

"Fraud is never presumed, either at law or in equity, but the burden is upon the party alleging to prove it, unless the circumstances shown are of such a strong and pregnant character that no other reasonable conclusion can be drawn from them, in which case the burden is shifted upon the other party to prove the bona fides of the transaction: and, if the presumptive circumstances are strong, they will outweigh positive testimony against it."

Starkie, Crim. Ev. (7th Ed.) p. 23, under the head of "Presumption of Intent to Defraud," says:

"This presumption is very similar to that of malice. It is always made whenever the natural consequence of the act is to defraud, and no proof is necessary that such was the intention of the prisoner."

Whart. Ev. § 1258, says:

"We infer the motive from the facts of the particular case. The process is one of induction from facts."

Even in cases of conspiracy the evidence is generally circumstantial. Though the common design is the essence of the charge, it is not necessary to prove that the defendants came together and actually agreed in terms to have that design, and to pursue it by common means. If it be proved that the defendants pursued by their acts the same object, often by the same means, one performing one part and another another part of the same, so as to complete it, with a view to the attainment of that same object, the court will be justified in the conclusion that they were engaged in a conspiracy to effect that object. 3 Greenl. Ev. (13th Ed.) § 93. One act may reflect its light upon another until the several acts grouped together make plain the object and purpose of all. These must be weighed, and receive separately and collectively the force and significance they deserve. Chief Justice Robertson, in Johnson v. Mallory, 2 Rob. (N. Y.) 683, said:

"There is scarcely an article made or work accomplished that has not been so by a series of efforts."

In Railroad Co. v. Hoge, 34 Pa. St. 221, Thompson, J., said:

"It is a great error, generally insisted on by defendants in cases involving questions of fraud, that each item of testimony is to be tested by its own individual intrinsic force, without reference to anything else in the case; and if, on such a test, it does not prove fraud, it must be excluded. The system of destroying in detail forces designed for concentrated action does well, doubtless, in military operations; but a skillful general never suffers such a disastrous result, except when he cannot prevent it. Courts have the power and must prevent such a system of assault, otherwise fraud would ever be victorious. It is a subtle element, and is to be traced out, if at all, by the small indices discoverable by the wayside where it travels; and to enable courts and juries to detect it they must in most cases aggregate many small items before the true features of it are discernible. Hence it is that great lati-

tude in the investigation is a rule never departed from in such cases. This rule is elementary, and a citation of authorities to prove it would not only be useless but superfluous."

From the determination made on the facts, aided by the authorities cited, certain legal results must be pronounced, and these must equal all emergencies. It is the just and proper pride of our matured system of equity jurisprudence that fraud vitiates every transaction; and however men may surround it with forms, solemn formalities, proceedings conforming to all the details required by the laws, or even by the formal judgment of the courts, a court of equity will disregard them all, if necessary, that justice and equity may prevail. Warner v. Blakeman, *43 N. Y. 487.

In conclusion, the court holds that the acts aforesaid vitiate the judgment and transfers, and they must be declared fraudulent and void as against honest judgment creditors. It follows, therefore, that the plaintiffs are entitled to a decree setting aside the general assignment and judgment, and for the other relief claimed herein, with costs.