McAdam, J.
The plaintiffs, wool dealers at St. Louis, Mo., in September, 1890, sold to a corporation known as the Bittenhouse Manufacturing Company, located at Passaic, Kew Jersey, a quantity of wool, aggregating in value about $34,888.17. The transaction, on the part of the Bittenhouse Company, was conducted by Mr. Gardner, its manager, • through a firm of wool brokers, known as Salter Brothers. Mr. Ammidown, one of the defendants, was president of the Bittenhouse Manufacturing Company, and at the same time senior member of the firm of Ammidown & Smith, composed of the defendants. Ammidown owned about ninety per cent, of the stock of the Bittenhouse Company, and had an interest to the extent of sixty per cent, in the firm of Ammidown & Smith.
About the time the wool reached Passaic Mr. Ammidown told Gardner that the wool must be sent to Kew York and placed in warehouses; that times were hard, ready money tight and difficult to get; that the notes of the corporation could not be sold, and lie would have to borrow money on the wool for present use. For *472 these reasons the wool was not taken from the cars, but- brought to New York, divided into three parcels, stored, and warehouse certificates procured in the name of the Bittenhouse Manufacturing Company. These three warehouse receipts were thereupon taken to the Bank of America and two other similar institutions, where the notes of the Bittenhouse Company, guaranteed by Ammidown and secured by these warehouse receipts, were discounted. The proceeds of the Bank of America discount, amounting to $9,200, were represented in a check drawn by that bank, indorsed first by Ammidown, then by his firm of Ammidown &” Smith, and passed to their credit in their bank.
Plaintiffs claim that their property was obtained by the Bitten - house Manufacturing Company by means of a fraud, to which Ammidown was a party, and that, in consequence, they have the right to follow the proceeds of the $9,200 draft, representing part of their property, into the hands of the defendants.
That the property was .obtained by fraud may be safely inferred from the evidence. The Bittenhouse Company, at the time it bought the wool, .was á corporation created by the laws of New Jersey, having a capital of $200,000. Three months before the wool was purchased, the books of the corporation showed a deficiency of $329,000, and on December 2, 1890, it was behind to the extent of $555,000; so that it was hopelessly insolvent, without the slightest prospect of continuing business’ or of meeting its .obligations. The wools purchased from the plaintiffs were evidently bought with the pre-conceived design not to pay for them. The circumstances overcome every presumption of innocence. The embarrassed condition of tiie Bittenhouse Company and of Ammidown, and the use they made of the plaintiffs’ wools, show that the intention of paying for them ' was never for a moment entertained. Indeed, payment therefor was impossible.
In Durell v. Haley, 1 Paige R., 492, Chancellor Walworth said : “If a purchaser who is insolvent conceals the fact from the vendor, and thus obtains goods without intending to pay for them, it is a fraud, and the property is npt changed in the hands of the vendee.” The same doctrine is asserted in Ash v. Putnam, 1 Hill, 302; Buckley v. Artcher, 21 Barb., 585; Morrison v. Garner, 7 Abb. Pr., 425; Devoe v. Brandt, 53 N. Y. 462; Johnson v. Monell, 2 Abb. Ct. App. Dec. 470; 2 Keyes, 655; Wright v. Brown, 67 N. Y. 1; Anonymous, Ib. 598.
It is sufficient if the intent exist at the time the goods are received, 'though subsequent to the sale. Whitten v. Fitzwater, 129 N. Y. 626; 41 St. Rep. 379. The combination of events is to be considered in determining the question. See Beardsley v. Duntley, 69 N. Y. 581; Hedges v. Payne, 44 St. Rep. 165 ; Abegg v. Schwab, 31 St. Rep. 139 ; 9 N. Y. Supp. 681; White v. Benjamin, 3 Misc. R. 505, 506.
It is not necessary for the evidence to show beyond a reasonable doubt that a party is guilty of fraud; nothing more is required than that the evidence shall be sufficient to satisfy the conscience of a common man, although the evidence does not. amount to absolute certainty. Bigelow on Fraud, 474, 475.
*473 The Ritteuliouse Company and Aminidown knew that the plaintiffs were supplying the wool, believing that it was to be used at the company’s mills; that it was needed there, and that they were doing, and likely to continue to do, a prosperous and paying business; and all intimation to the. contrary was carefully suppressed. It must have been known that if the plaintiff's had the faintest idea of the hopeless insolvency of the Ritteuliouse Company, or of Ammidown, they would not have parted with over $34,000 of their property, particularly if it had been suspected that, instead of using the wools at their mills for manufacturing purposes, in the usual course of business, the vendees intended, as soon as they received the wools, to put them in storage with the sole object of raising their value in money for the benefit of others—a course which destroyed all possibility of payment to the vendors. If the plan which was carried out successfully was not preconceived, the result and consequences to the vendors were just the same, and as between them and the vendees the former might have rescinded the sale and reclaimed the property. Nichols v. Michaels, 23 N. Y. at p. 266. Vide cases before cited.
A bona fide purchaser from a fraudulent vendee will be protected, however. Bell v. Shell, 21 Wend. 222; Mowrey v. Walsh, 8 Cow. 238; Keyser v. Harbeck, 3 Duer, 341; Fassett v. Smith, 23 N. Y. 252; Paddon v. Taylor, 44 N. Y. 371. But it devolves upon the latter to establish that he is a bona fide purchaser, and that he has parted with value without notice of the fraudulent title of the person from whom he got the property. Porter v. Davis, 49 N. Y. 566; Stevens v. Brennan, 79 N. Y. 254; Dows v. Kidder, 84 N. Y. 12; Meecham v. Collignon, 7 Daly 402; Mather v. Freelove, 3 St. Rep. 424. A transfer as security for or in payment of a precedent debt will not make the transferee a bona fide purchaser within the rule. Stevens v. Brennan, and other cases, supra.
Wherever the property of another has been wrongfully misapplied, or a trust fund has been wrongfully converted into another species of property, if its identity can be traced, it will be held in its new form liable to the rights of the original owner. 2 Story’s Eq. §§ 1265, 1258.
Equity impresses a trust upon it in favor of the one equitably entitled to the same against anyone receiving the fund but a purchaser in good faith and without notice. 2 Pom. Eq. §§ 1048, 1053; Perry on Trusts, § 166. The product or substitute for the original thing still follows the nature of the thing itself, so long as it can be ascertained to be such, and the light only ceases when the means of ascertainment fail. Taylor v. Plummer, 3 Maul. & S. 562; Cavin v. Gleason, 105 N. Y. 256; 7 St. Rep. 13; Bank v. King, 57 Penn. St. R. 302; Bank v. Ins. Co., 104 U. S. 69; Ferris v. Van Vechten, 73 N. Y. 113. Where the property has been converted into money such proceeds may (with certain limitations hereinafter referred to) be followed just the same as the goods might have been. Dows v. Kidder, 84 N. Y. 121; Van Alen v. Am. Nat. Bank, 52 N. Y. 1; Holmes v. Gilman, 138 N. Y. 369 ; 52 St. Rep. 873; 30 Abb. N. C. 212.
*474 The Bank of America, in good faith and without notice, advanced upon the warehouse receipts $9,200, and to-that extent acquired a valid lien thereon, and the question is whether the defendants herein acquired, as against the plaintiffs, any right to retain the proceeds, which went into their hands in the form of a check' drawn by the bank, which was indorsed, first by Ammidown, next by his firm, and deposited to their credit in the Importers & Traders’ Bank. , Up to the time the check Was in Ammidown’s hands, as president of the Rittenhouse Company, and so long as it remained there, the proceeds could have been recovered from him by the plaintiffs. If the title of the firm of Ammidown & Smith is affected in like manner, there is no defense, and the decision of this question depends to a large extent upon whether the knowledge of Ammidown is to be imputed to his copartner Smith, and so to the firm of which he was a member ; for if it is, it becomes evident that that firm cannot receive the protection accorded to bona fide transferees of property.
In this connection it must be conceded that where a party occupies a dual position, or numerous positions, such as president of one company, treasurer of another, secretary of a third, and member of a firm, the knowledge acquired in one capacity is not, as a rule, imputable to the other concerns to which such knowledge does not, by the position occupied, rightfully belong. Therefore, the knowledge that Ammidown acquired while acting as president of the Rittenhouse Manufacturing Company, did not necessarily charge Smith, his copartner, who was in a legal sense a stranger to the Rittenhouse Manufacturing Company, and not bound to know the facts connected with its business. Ammidown was under no obligation- to make these facts known to Smith, and it will not be inferred that he communicated them to him.
But the transaction did not stand alone. Ammidown & Smith were the consignees of the Rittenhouse Manufacturing Company, having an arrangement with it by which all its manufactured goods came to their firm, under an agreement by which théy- were to advance 75 per cent, of the market value. These advances had been made from time to "time, covering a period of years, going-back as far as 1883. So that, at the time when the plaintiffs’ wools were received the Rittenhousq Manufacturing Company owed Ammidown & Smith, for over-drafts on consignments, a sum aggregating about $276,000. Smith knew the financial condition of the Rittenhouse Company and, indeed, had for a long time suspected its, stability; so that he refused to have his firm make advances unless Ammidown personally guaranteed every payment. This Ammidown did. Hence, Smith was chargeable with the knowledge which his different relations to the transaction gave him, and to such as may be reasonably inferred from the action of the firm as such.
True, Smith had no pei-sonal knowledge concerning the purchase, storage or pledging of the plaintiffs’ wools, and if the proceeds of the check from the Bank of America had not been passed to the firm’s credit no liability would have attached to the defendants jointly. But Ammidown brought the check into the firm *475 and it was deposited to the firm’s credit. Did the firm by this act become chargeable with Amrnidown’s knowledge of the transaction that put it there ? In taking advantage of Ammidown’s act of bringing in the check, the firm of Ammidown & Smith took it impressed with his knowledge as to the source from which it came, even though such knowledge was not acquired in the course of his agency as a member of the firm. Constant v. University of Rochester, 111 N. Y. 604; 20 St. Rep. 211.
The defendants claim that payifig in the check of the Bank of America was the official act of Ammidown as the president of the Rittenhouse Company, and thaf the payment imputed no knowledge to his firm, further than the fact of payment But Ammidown did more; he acted for his firm in receiving the money and putting it in the Importers and Traders’ Bank to its credit, and by this act he associated his firm with the transaction by making it the beneficiaries thereof. It cannot be that the same person can, as a corporation president, commit a fraud on the public, and immediately thereafter, by his own act, give a firm of which he is a member the benefit of it, and in that simple manner make the fruits of the fraud safe from legal accountability. There must be some well defined boundary line drawn where the acts of the same person, in the same capacity, for legal purposes stop, and those in the other commence; where the doctrine of imputed knowledge in the new concern succeeds the actual knowledge gained in the former. It was at one time held that notice to the agent, in order to bind his principal by constructive notice, must be in the same transaction. But the court,, in Constant v. The University of Rochester, supra, held that the rule should not be so limited, when clear proof is made that the knowledge or notice “was present in the mind of the agent at the time.of the transaction in question.”
The wools were purchased on September 10th; they were put in the warehouses on September 24th, were pledged September 26th, and on the same day the money was turned over to his firm by Ammidown; so that, under the test applied in the Constant case, the details of the entire transaction were present ,in Ammidown’s mind when his firm became a party to it. Ammidown was the senior member of the firm, directing its affairs and controlling its course, and held out by the firm as worthy of confidence. There are equitable reasons, therefore, why the rule as to imputed knowledge should be applied to the defendants’ firm in furtherance Of justice.
In Holden v. N. Y. & Erie Bank, 72 N. Y. 286, it was held that where the agency was continuous and made up of a long series of transactions of the same general character, knowledge acquired by the agent in one or more of the transactions is notice to the agent and the principal, which will affect the latter in any other transaction in which the agent, as such, is engaged and in which the knowledge is material.
The application of the doctrine of imputed notice is all important in this case, because the check of the bank, being negotiable like money, was passed to the credit of the *476 Rittenhouse Company as payment pro tanto of its indebtedness, and if so applied in good faith, without notice or anything to put the firm as such on inquiry, that act alone was sufficient to vest title to the money in the defendants. Stephens v. Board, 79 N. Y. 183; Justh v. Nat. Bank, 56 N. Y. 478 ; and see Southwich v. First Nat. Bank, 84 N. Y. 420; Newhall v. Wyatt, 139 N. Y. 452; 54 St. Rep. 708. And this upon the ground that money is currency—has no ear marks—that its possession vests title in the holder, as to third persons dealing with him and receiving it in due course of business and in good faith, even in payment of a precedent account.
The defendants go further than the making of the ordinary bookkeeping entries, and show that the firm not only kept the usual ledger account with the Rittenhouse Company, on which the draft was credited to it, but had added thereto a system of entries in what is called the “ advance book," which was kept for the information of the Rittenhouse Manufacturing Company, that it might know to what extent it could draw against the firm of Ammidown & Smith. . It had been arranged before this that, after drawing the 75 per cent, of the market value of the goods consigned to Ammidown & Smith, the other 25 per cent, was to go in reduction of the debt of that company to the firm. Smith claims that when the proceeds of these drafts were received they were put on the advance book in the form of-a credit to the Rittenhouse Company, and that the company drew upon Ammidown & Smith, not only for the 75 per cent, which they were allowed to draw under the agreement, but for th§ proceeds of these discounts as well; that in this manner the proceeds were turned- over to the company before any notice of the plaintiffs’ claim, and that by such turning over, Smith, as a.member of the firm, and Ammidown & Smith as a firm, derived no benefit or profit whateyer from the proceeds of the discounts, and are, therefore, not chargeable in respect thereto.
While there is force in this circumstance—sufficient almost to warrant a finding of good faith on the part of the firm as a firm— it must be deemed controlled by Smith’s actual knowledge of the insolvency of the Rittenhouse Company, and imputed knowledge of the fact that the proceeds were from discounts made on warehouse receipts for wool fraudulently purchased from the plaintiffs, which had not been paid for; and this knowledge destroyed all right to protection in behalf of the firm as bona fide transferees.
If Smith did not- acquire full knowledge on the subject, he had sufficient notice to put him upon inquiry, and the rule is that where circumstances are such as to put a person upon his inquiry, he is chargeable with every knowledge which the inquiry would have disclosed if it had been properly followed up. Williamson v. Brown, 15 N. Y. 364. Failure to follow a reasonable clue is “ such gross negligence as would be a cloak for fraud if permitted, and it must be held to amount to constructive notice." Whitbread v. Jordan, 1 You. & C. Eq. 303. And “when a party having knowledge of such facts as would lead any honest man, using ordinary caution, to make further inquiries, does not make, but, on the contrary, studiously avoids making such obvious inquiries, he must *477 be taken to have notice of those facts which, if he had used such ordinary diligence, he would readily have ascertained. Ib. 328; and see Wright v. Cabot, 89 N. Y. 570; Edwards v. Dooley, 120 N. Y. 553; 31 St. Rep. 710.
If Smith chose to remain ignorant in regard to matters about which he might have informed himself, that was his right; but he cannot put the consequences upon others, and must be held, so far as they are concerned, to be chargeable with the knowledge which inquiries properly pursued would have revealed. These inquiries, if made, would have disclosed the true state of facts before detailed, and would have left him with his partner’s knowledge of the fact that the proceeds of the wool equitably belonged to the defrauded owners of the wool from which the proceeds came.
Under these circumstances the defendants are chargeable with the amount of the proceeds, $9,242,44, with interest, aggregating $11,178, and for this aum, with $250 allowance, the plaintiffs are entitled to judgment.